DA 08-0085

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 285

CHAD MALCOLM and JESSICA MALCOLM,
Personal Representatives of the ESTATE OF
TYLER MALCOLM,

     Plaintiffs and Appellees,

  v.

EVENFLO COMPANY, INC., f/k/a EVENFLO
JUVENILE FURNITURE COMPANY and EVENFLO
JUVENILE FURNITURE CO., INC.,

     Defendant and Appellant.

APPEAL FROM:    District Court of the Sixth Judicial District,
                  In and For the County of Park, Cause No. DV 03-69
                  Honorable Wm. Nels Swandal, Presiding Judge

COUNSEL OF RECORD:

     For Appellant:

          James H. Goetz (argued), Goetz, Gallik & Baldwin, Bozeman, MT
          Allan H. Baris, Moore, O'Connell & Refling, Bozeman, MT
          Earl W. "Billy" Gunn and Charles L. Clay, Jr., Weinberg, Wheeler,
          Hudgins, Gunn & Dial, Atlanta, GA
          Patrick J. Murphy, Williams, Porter, Day & Nevill, Casper, WY

     For Appellees:

          L. Randall Bishop (argued), Jarussi & Bishop, Billings, MT
          Evan A. Douthit, Douthit, Frets, Rouse, Gentile & Rhodes, Kansas City,
          MO

     For Amicus Montana Trial Lawyers:

          Lawrence A. Anderson, Attorney at Law, Great Falls, MT
     For Amicus Montana Defense Trial Lawyers:

Robert C. Lukes and Randall J. Colbert, Garlington, Lohn & Robinson, Missoula, MT

For Amicus The Alliance of Automobile Manufacturers, Inc.:

Randy J. Cox, Boone Karlberg, Missoula, MT

_____

Argued:     February 25, 2009
Submitted:  May 5, 2009
Decided:    September 14, 2009

Filed:

_____
Clerk

2

Justice Brian Morris delivered the Opinion of the Court.

¶1     Chad and Jessica Malcolm (collectively Malcolms) sued Evenflo Company, Inc. (Evenflo) after their four-month-old son Tyler suffered fatal brain injuries in a rollover car accident.  The Malcolms alleged that the Evenflo "On My Way" (OMW) child safety seat contained a design defect that caused Tyler's death.  The Malcolms asserted strict liability in tort.  Evenflo appeals from a judgment in the Sixth Judicial District, Park County, following a jury trial.  We affirm in part, reverse in part, and remand for further proceedings.

¶2     We review the following issues on appeal:

¶3     *Did the District Court abuse its discretion when it excluded Evenflo's evidence that the OMW model 207 complied with FMVSS 213 for the purposes of compensatory damages?*

¶4     *Did the District Court abuse its discretion by admitting evidence regarding the recall and test failures of the OMW model 206?*

¶5     *Did the District Court abuse its discretion by applying unfairly its FMVSS 213 evidentiary ruling with respect to compensatory damages?*

¶6     *Did the District Court abuse its discretion when it excluded Evenflo's FMVSS 213 compliance evidence with respect to punitive damages?*

## FACTUAL AND PROCEDURAL BACKGROUND

**The "On My Way" Child Safety Seat**

¶7    Evenflo manufactures child restraint systems, or child seats. Evenflo marketed the OMW as a rear-facing vehicle child safety seat intended for transporting infants weighing up to 20 pounds. Evenflo designed the OMW for use with or without its detachable base. The user routed the vehicle's seat belt through an enclosed seat belt "tunnel" on the base when they used the detachable base. The seat then latched into the base. The user also could unlatch the seat from the base and use it as a baby carrier. When used without the base, Evenflo designed the seat belt to be slipped into a U-shaped, open-ended plastic seat belt hook on one side of the seat. The user would route the seat belt over the seat's foot-end and through an open-ended plastic seat belt hook on the other side of the seat. The user then latched the seat belt into the vehicle's seat belt buckle.

¶8    The National Highway Traffic and Safety Administration (NHTSA) requires that all child restraint systems comply with the minimum requirements of Federal Motor Vehicle Safety Standard 213 (FMVSS 213). *See* 49 C.F.R. § 571.213 (2009). NHTSA required Evenflo to conduct internal testing of the OMW to determine if it complied with the FMVSS 213 standards. NHTSA and Transport Canada, the Canadian testing agency, conducted random audit FMVSS 213 tests in addition to Evenflo's internal testing.

¶9    FMVSS testing consists in part of a front-end sled test at speeds of 27-30 mph. *See* 49 C.F.R. § 571.213 (1994). In the sled test, the tester accelerates a child restraint seat and a test dummy to 30 mph and crashes it into a frontal barrier. The child restraint seat must manage the force from the crash "so that the forces imparted to the dummy are

4

within tolerable limits." 67 Fed. Reg. 21806, 21812 (May 1, 2002). FMVSS 213 does not require side-impact, rear-impact, or rollover testing.

¶10 Evenflo first manufactured the OMW model 206 in May of 1994. By February of 1995, Evenflo's internal testing indicated that the production model 206 was prone to failure of the plastic seat belt hooks and/or the adjacent plastic shell. Internal videotapes showed the OMW seats breaking apart in the area of the vehicle seat belt path. The breaking caused the OMW to come loose from the test sled's seat belt. The videotapes depicted the OMW ejecting from the sled due to the open belt hook design.

¶11 Evenflo briefly halted production of the OMW. Evenflo notified NHTSA on June 12, 1995, that it was going to conduct a "consumer corrective action/recall campaign" as the OMW did not meet the requirements of FMVSS 213. Evenflo represented to NHTSA that the hazard posed by the design of the OMW model 206 was a "separation" under the seat's cloth padding that resulted in a sharp edge that could cause a "cut or pinch" hazard to the child. Evenflo did not notify NHTSA that the OMW's belt hooks had broken off in some tests and that these breaks had caused the OMW to detach from the vehicle restraint system.

¶12 Evenflo had manufactured and sold approximately 200,000 OMWs at the time of the recall. Evenflo designed a plastic "retrofit kit" to be riveted into the underside of the safety seat. Evenflo mailed the plastic retrofit kit to the current OMW users. Evenflo described the recall as a "consumer corrective action" and instructed the OMW owners to install the plastic insert using double-sided tape. Evenflo also had approximately 55,000

5

OMW model 206s in its inventory at the time of the recall. Evenflo installed the retrofit kit on its unsold inventory. Evenflo rebranded the retrofitted OMWs as model 207x and sent all 55,000 seats to retailers.

¶13 Evenflo altered the plastic mold used to create the OMW at a total cost of $2500. Evenflo added ribs, gussets, and fillets and designated the modified OMW as model 207. Evenflo did not change the OMW's open belt hook design. Evenflo resumed production of the OMW model 207 in July of 1995.

¶14 In 1997, Ruthie Gonzales of Merced, California, reported to Evenflo that her retrofitted model 207 OMW's belt hook had broken off during a rollover accident. The OMW came loose from the seatbelt and ended up on her front dashboard. Devon Orneleas of Patterson, California, reported to Evenflo on August 10, 1999, that both belt hooks had broken off her production model 207 in a rollover accident. Ms. Orneleas testified that the OMW came loose from the vehicle seat belt and flew forward when the seat hooks fractured and broke away. Ms. Orneleas found her baby, still secured in the child seat, on the front seat floorboard after the rollover.

¶15 Ms. Orneleas testified that she had reported the incident because she wanted Evenflo to know "that they had a defective product and I wanted them to recall it." Ms. Orneleas testified that when she called Evenflo, the customer service representative said that "she was shocked and hadn't heard of that before." Ms. Orneleas further testified that Evenflo had called her back and told her that the OMW was designed to withstand only a 30 mph frontal crash, rather than the physical forces present in a rollover crash.

6

¶16    Evenflo denied that it had made this statement and claimed that Ms. Orneleas "must have misunderstood." Three other OMW owners also called Evenflo in the years before the Malcolm accident to report that seatbelts had slipped out of the open belt hook of the OMW in rollover, side-impact, and rear-end situations. Evenflo did not test the OMW in rear-end, side impact, or rollover scenarios before the Malcolm accident.

**The Malcolm Accident**

¶17    The Malcolms lived south of Livingston, Montana, on a ranch near Emigrant. Chad Malcolm was the fourth generation of the family to ranch in the area. A friend gave Jessica Malcolm the OMW while Jessica was pregnant with Tyler. Jessica called Evenflo to ask if the OMW model 207 was safe to use. Evenflo assured her that the OMW was not subject to any of their recalls and that the OMW was safe to use. Evenflo Director of Product Safety Randolph Kiser testified that Jessica Malcolm did not have a right to know about the cracking during testing or the owner reports of seatbelts slipping out of the open belt hooks unless Evenflo considered the problem to be a "rampant safety related defect."

¶18    Jessica Malcolm drove to Emigrant on the evening of July 16, 2000, in her 1996 Suburban to pick up pizza and a movie with her sister and her son Tyler. She then drove back south on Highway 89 toward the ranch. Malcolm's sister rode in the passenger seat and Tyler rode in the back in the OMW model 207 child seat. A northbound motorist swerved into Malcolm's lane and forced Malcolm off the road. The Suburban rolled

7

three times, traveled down a steep incline, and stopped in a ditch. The accident occurred within sight of the Malcolms' ranch.

¶19 Jessica Malcolm did not suffer serious injury. Her sister sustained a severe head injury. The left belt hook of the OMW broke off during the rollover. The seat belt slipped out from the open-ended belt hook on the opposite side of the seat. The forces of the accident ejected the OMW from the Suburban. The OMW came to rest approximately 60 feet from the Suburban. Tyler remained strapped in the OMW. Tyler suffered brain injuries that resulted in his death.

**Pretrial**

¶20 The Malcolms' case sounded exclusively in strict liability in tort, design defect theory. The Malcolms claimed that the Evenflo OMW model 207 infant child safety seat constituted a defectively designed product that failed catastrophically even though they had used the seat in a reasonably anticipated manner. The Malcolms pointed to the OMW's open-ended belt hook design and the lack of expanded polystyrene (EPS) padding. The Malcolms contended that Evenflo could have manufactured the OMW using a feasible superior alternative design that required the vehicle's seatbelt to be routed through an enclosed seat belt tunnel even when the seat was used without the base. The Malcolms also sought punitive damages. The Malcolms alleged that Evenflo "continued selling the defective product in conscious, deliberate and intentional disregard of the danger presented."

8

¶21 Evenflo contended that the OMW model 207 was not defective in any way. Evenflo argued that the severity of the forces involved in the accident solely caused Tyler's death. Evenflo argued that the "tremendous forces" that occurred during the rollover forced open the rear passenger door, which was immediately adjacent to Tyler's child seat. Evenflo posited that Tyler's car seat came into direct contact with the ground as the Suburban rolled. Evenflo suggested that the contact caused the seat to detach from the seat belt system and ultimately fly out the open door. Evenflo emphasized that the production model 207 passed each of the FMVSS tests conducted on the seat. Evenflo also argued that the OMW model 207 differed completely from the OMW model 206.

¶22 The parties conducted extensive discovery and filed numerous pretrial motions. Evenflo contended in its motion for partial summary judgment on the issue of punitive damages that "there is a complete absence of evidence of either actual fraud or actual malice." Evenflo also claimed that its alleged compliance with FMVSS 213 preempted the Malcolms' punitive damages claim. The District Court rejected Evenflo's preemption claim and concluded that Evenflo had failed to show an absence of genuine issues of material fact regarding punitive damages.

¶23 The District Court granted the Malcolms' motion in limine to exclude arguments by Evenflo that the OMW model 207 complied with FMVSS 213. The District Court reasoned that evidence of compliance with FMVSS 213 "does not appear to be relevant to the issues or facts in this case." The District Court stated that even if evidence of Evenflo's alleged compliance with FMVSS 213 was relevant, "it is more prejudicial than

9

probative and would confuse the jury." The District Court denied Evenflo's motion for reconsideration.

**Trial**

¶24 The District Court conducted a jury trial from July 16 to July 25, 2007. The Malcolms testified as to the severe trauma that resulted from Tyler's death. Jessica and Chad both had undergone personality changes. Chad Malcolm no longer could perform competently the daily ranch work. The Malcolms could not face living in such close proximity to the location of the accident. The Malcolms eventually moved into Livingston. Chad went to work for a gravel company. Jessica obtained certification as a child seat fit expert and advocated for safer child seats.

¶25 Both sides presented expert witnesses. The Malcolms contended that the OMW model 206 and model 207 were identical with respect to the faulty design of the open belt hook and the lack of padding. The Malcolms' design expert Lou D'Aulerio testified that he had analyzed 582 sled tests conducted on the OMW under the FMVSS 213 standards. The tests included the OMW models 206 and 207 and prototypes. D'Aulerio compiled an 11-page chart titled "Chronological List of Test Failures." The chart included a column of "Test Report Remarks" that consisted of excerpts from the test reports that described cracks, tears, and other "failures" of the shell. D'Aulerio determined that Evenflo had noted that the plastic shell had cracked or fractured in 157, or 27%, of the tests. D'Aulerio designated these tests "failures." The Malcolms also mentioned these test "failures" during their opening statement and closing argument.

10

¶26    Evenflo argued that many of the tests cited by D'Aulerio were irrelevant because they involved models other than the model 207. Evenflo insisted that the District Court should allow Evenflo to respond to D'Aulerio's testimony by introducing evidence that the OMW model 207 had passed each test based on FMVSS 213 standards. Evenflo contended that the District Court unfairly was applying its motion in limine regarding FMVSS 213 testing by allowing the Malcolms to introduce evidence that the OMW model 206 had "failed" during testing without allowing Evenflo to introduce evidence that the OMW model 207 had "passed" according to the minimal requirements of FMVSS 213 in each of those instances. The District Court rejected Evenflo's arguments regarding FMVSS 213.

¶27    The jury awarded the Malcolms $6,697,491 in compensatory damages. The jury also awarded the Malcolms $3,700,000 in punitive damages in a separate proceeding conducted the following day, pursuant to § 27-1-221(7)(a), MCA.

**Post-trial**

¶28    The District Court reviewed the jury's award of punitive damages as required by § 27-1-221(7)(c), MCA. Evenflo argued that the court improperly had excluded evidence of Evenflo's compliance with FMVSS 213. Evenflo relied in part on this Court's decision in *Sunburst School Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, 338 Mont. 259, 165 P.3d 1079, which we decided after the jury's verdict in this case. The District Court affirmed the jury's punitive damages award. The District Court also denied Evenflo's

11

post-trial motions, including its motion for a new trial, motion for remittitur, motion for judgment as a matter of law. Evenflo appeals.

## STANDARD OF REVIEW

¶29 We review a district court's evidentiary rulings for an abuse of discretion. *Sunburst*, ¶ 74. A district court possesses broad discretion to determine the admissibility of evidence. *Sunburst*, ¶ 74. A district court abuses its discretion when it acts arbitrarily without conscientious judgment or so exceeds the bounds of reason as to work a substantial injustice. *State v. Giddings*, 2009 MT 61, ¶ 42, 349 Mont. 347, 208 P.3d 363.

## DISCUSSION

¶30 *Did the District Court abuse its discretion when it excluded Evenflo's evidence that the OMW model 207 complied with FMVSS 213 for the purposes of compensatory damages?*

¶31 Section 27-1-719, MCA, governs design defect liability in Montana. A person who sells a product in a defective condition is liable for the physical harm caused by the defective product. Section 27-1-719, MCA; *Wise v. Ford Motor Company*, 284 Mont. 336, 340, 943 P.2d 1310, 1312 (1997). A product is defective if it is dangerous to an extent beyond that anticipated by the ordinary user. *McAlpine v. Rhone-Poulenc Ag Co*., 2000 MT 383, ¶ 25, 304 Mont. 31, 16 P.3d 1054; Mont. Pattern Jury Instr. Civ. 7.01 (2d rev. ed. 2003).

¶32 Strict liability recognizes that the seller is in the best position to insure product safety. *Sternhagen v. Dow Co.*, 282 Mont. 168, 180, 935 P.2d 1139, 1146 (1997).

Design defect liability therefore places the risk of loss on the manufacturer. This imposition of risk provides "an incentive to design and produce fail-safe products which exceed reasonable standards of safety." *Sternhagen*, 282 Mont. at 178, 935 P.2d at 1145. Design defect strict liability may be imposed even if the seller has "exercised all possible care," and even though the product was faultlessly manufactured. *See McAlpine*, ¶¶ 17, 21; § 27-1-719, MCA; Mont. Pattern Jury Instr. Civ. 7.00, 7.02 (2d rev. ed. 2003).

¶33 Evenflo argues that the District Court abused its discretion when it excluded any evidence that the OMW model 207 complied with FMVSS 213. Evenflo contends that the fact that the OMW model 207 passed 341 tests performed under FMVSS 213 is "highly relevant to [the Malcolms'] claim that the model 207 was defective and unreasonably dangerous." Evenflo opines that FMVSS 213 is a "severe" test with "strict performance standards."

¶34 Evenflo urges this Court to adopt the *Restatement (Third) of Torts: Products Liability* § 4 (1998). Section 4 provides that compliance with an applicable regulation is admissible in connection with liability for defective design. Evenflo contends that the majority of jurisdictions hold that compliance with product safety regulation is relevant and admissible on the question of defectiveness, but is not necessarily controlling. Evenflo also contends that this Court has adopted the *Restatement (Third)* approach in the negligence context. Evenflo argues that "[t]here is no reason why such highly relevant evidence should be admissible in negligence, but not products liability cases."

13

¶35 Evenflo points to *Martel v. Montana Power Co.*, 231 Mont. 96, 752 P.2d 140 (1988). Martel suffered severe injuries after coming into contact with power lines owned by Montana Power. *Martel*, 231 Mont. at 98-99, 752 P.2d at 142. Martel alleged that Montana Power negligently had failed to comply with the National Electric Safety Code. *Martel*, 231 Mont. at 100-03, 752 P.2d at 142-45. The Court held that a violation of "design standards intended to protect the public" constitutes negligence per se. *Martel*, 231 Mont. at 103, 752 P.2d at 145. The Court further noted that bare compliance with such a statute does not necessarily establish due care. *Martel*, 231 Mont. at 104, 752 P.2d at 145.

¶36 This Court reiterated those principles in *Schmidt v. Washington Contractors Group, Inc.*, 1998 MT 194, 290 Mont. 276, 964 P.2d 34. Schmidt sustained injuries when he crashed his motorcycle while descending a temporary freeway entrance ramp in a construction zone. *Schmidt,* ¶ 3. The Court noted that the construction company owed a duty of ordinary care in maintaining the road construction site in a reasonably safe condition. *Schmidt,* ¶ 15. The construction company argued that it was not negligent as it properly had posted warning signs as required by the Manual of Uniform Traffic Control Devices (MUTCD). *Schmidt,* ¶ 12. The Court stated that "evidence of compliance with the MUTCD does not necessarily establish due care because the MUTCD, like any other national industry standard or code, is only a minimum standard." *Schmidt,* ¶ 17.

14

¶37    The District Court correctly recognized, however, that Montana draws "a bright line" between cases asserting strict liability in tort and those grounded in negligence theory. The court pointed to *Lutz v. National Crane Corp.*, 267 Mont. 368, 385, 884 P.2d 455, 465 (1994). Lutz died from electrocution when a crane's cable contacted a power line. *Lutz*, 267 Mont. at 372, 884 P.2d at 457. Lutz's estate claimed that the crane's failure to include insulating links constituted a defective design. *Lutz*, 267 Mont. at 372-73, 884 P.2d at 457. The manufacturer attempted to introduce evidence that governmental regulations did not require that cranes be equipped with insulated links. *Lutz*, 267 Mont. at 384, 884 P.2d at 464. This Court affirmed the district court's exclusion of the evidence. *Lutz*, 267 Mont. at 385, 884 P.2d at 465. The Court observed that "[w]hile most courts allow government regulations to be used against manufacturers in negligence cases, the same is not true where the issue is strict liability." *Lutz*, 267 Mont. at 385, 884 P.2d at 465. The Court emphasized that "[the] issue in products liability cases is not the *conduct* of the 'reasonable person,' but the *condition* of the product." *Lutz*, 267 Mont. at 380, 884 P.2d at 462 (emphasis in original). The Court rejected the manufacturer's attempt "to interject negligence concepts into this design defect case." *Lutz*, 267 Mont. at 379, 884 P.2d at 461.

¶38    This Court again distinguished strict liability from negligence when it rejected the "state of the art" defense in *Sternhagen*, 282 Mont. at 182, 935 P.2d at 1147. The Court determined that the state of the art defense "raises issues of reasonableness and foreseeablility–concepts fundamental to negligence law–to determine a manufacturer's

15

liability." *Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144. The attempt to inject negligence principles into strict liability law would "sever Montana's strict products liability law from the core principles for which it was adopted—maximum protection for consumers against dangerous defects in manufactured products." *Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144. The Court recognized that the focus in design defect cases shines on "the condition of the product," rather than "the manufacturer's conduct or knowledge." *Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144. The Court determined that the "strict duty mandated by the theory of strict liability is warranted even though in some situations it may result in liability being imposed upon careful manufacturers." *Sternhagen*, 282 Mont. at 178, 935 P.2d at 1145.

¶39 We likewise reject Evenflo's efforts to inject negligence principles into the strict liability setting. We decline to adopt the *Restatement (Third) of Torts: Products Liability,* § 4. Section 4 conflicts with the core principles of Montana's strict products liability law. To recognize Section 4 improperly would inject into strict products liability analysis the manufacturer's reasonableness and level of care—concepts that are fundamental to negligence law, but irrelevant on the issue of design defect liability. *Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144; *McAlpine*, ¶¶ 17, 21; § 27-1-719, MCA; Mont. Pattern Jury Instr. Civ. 7.00, 7.02 (2d rev. ed. 2003). The District Court correctly relied upon Montana precedent that emphasizes the fundamental difference between strict liability and negligence law. *See Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144; *Lutz*,

16

267 Mont. at 379-80, 884 P.2d at 461-62; *see also Kuiper v. Goodyear Tire & Rubber Co.*, 207 Mont. 37, 63-64, 673 P.2d 1208, 1222.

¶40 The Dissent raises the specter of the "camel's nose in the tent" despite our explicit rejection of the *Restatement (Third) of Torts: Products Liability* § 4. *See* ¶ 119. The Dissent insists that our decision somehow will assist corporations to overturn "well-settled, decades-old principles of strict liability" and convince the courts or the legislature to adopt the *Restatement (Third) of Torts: Products Liability* § 4. We discuss at length and approve in ¶¶ 31-39 the "well-settled, decades-old principles of strict liability" for which the dissent fears. Our decision in fact slams the door on the camel's nose. Only in a desert mirage could our clear repudiation of the *Restatement (Third) of Torts: Products Liability* § 4, and our corresponding affirmation of the "well-settled, decades-old principles of strict liability," be seen to facilitate the camel's entry into the tent.

¶41 A district court abuses its broad discretion regarding the admissibility of evidence if it acts arbitrarily without conscientious judgment or so exceeds the bounds of reason so as to work a substantial injustice. *Sunburst,* ¶ 74; *Giddings*, ¶ 42. The District Court extensively analyzed both FMVSS 213 and the nature of the Malcolm accident in determining that evidence of compliance with FMVSS 213 would not be relevant to the question of whether Evenflo had sold the OMW model 207 in a defective condition. The District Court emphasized in its post-trial order that the FMVSS 213 "addresses only minimum levels of performance in 27-30 mph *frontal* impacts." The court further noted that "FMVSS 213 does not set forth any requirements, or create any reasonable

17

expectations in the mind of the manufacturer, concerning the dynamic performance of a child seat in a motor vehicle rollover." The court stated that evidence at trial had established that "the dynamic forces unleashed in a high-speed rollover collision are very different from those present in a minimal 27 to 30 mph frontal crash."

¶42 The District Court added that "the risk of mischief and jury confusion" inherent in allowing Evenflo to defend based on the "self-serving" argument that the OMW model 207 had "passed" FMVSS 213 was "particularly apparent when the limited purpose of the federal motor vehicle standards is viewed in the light of Montana products liability law." The District Court recognized that the safety standards are "a minimum standard for motor vehicle or motor vehicle equipment performance." *See* 49 U.S.C. § 30102(a)(9) (2006). The court emphasized that Congress has established that a person may not use compliance with a motor vehicle safety standard as a defense at common law and compliance does not exempt a person from liability at common law. *See* 49 U.S.C. § 30103(e) (2006); H.R. Rpt. 1776 at 24 (July 28, 1966).

¶43 The District Court also highlighted the letter of NHTSA Administrator Ricardo Martinez, M.D., sent to manufacturers, including Evenflo, on September 14, 1999. Dr. Martinez stated that "mere compliance with the minimum requirements of the standard is not enough." Dr. Martinez urged manufacturers to "ensure that their restraints perform above the minimum requirements" of the safety standards. *See* 65 Fed. Reg. 1224, 1224-25. (Jan. 7, 2000). The District Court concluded that Dr. Martinez's warning was "consistent with the theory and goal of [Montana] law governing strict product design

18

defect liability." The court correctly noted that Evenflo could be liable under Montana law for design defect liability even if it had "exercised all possible care" and even if the OMW had been faultlessly manufactured. *See McAlpine*, ¶¶ 17, 21; § 27-1-719, MCA; Mont. Pattern Jury Instr. Civ. 7.00, 7.02 (2d rev. ed. 2003).

¶44 We conclude that the District Court did not act arbitrarily without conscientious judgment when it denied Evenflo's evidence of compliance with FMVSS 213. *Giddings*, ¶ 42. The District Court acted within its "broad discretion" when it determined that evidence of the OMW model 207's compliance with FMVSS 213 would be irrelevant to the Malcolms' design defect strict liability claim. *Sunburst*, ¶ 74. We also cannot determine that the District Court abused its discretion when it concluded that even if Evenflo's compliance with FMVSS 213's "minimal standards" would be relevant, the evidence would be more prejudicial than probative and might tend to mislead or confuse the jury. *Sunburst*, ¶ 74. The District Court's evidentiary rulings properly focused the jury's compensatory damages analysis on the condition of the OMW rather than on the conduct of Evenflo. *Lutz*, 267 Mont. 368 at 380, 884 P.2d at 462.

¶45 *Did the District Court abuse its discretion by admitting evidence regarding the recall and test failures of the OMW model 206?*

¶46 Evenflo claims prejudice from the District Court's decision to allow the Malcolms to introduce evidence regarding the testing and the 1995 recall of the OMW model 206. Evenflo argues that the court allowed the Malcolms to "put on trial a different child seat" than the Malcolms' OMW model 207. Evenflo contends that the OMW model 206 and

model 207 are substantially different seats and that the mode of alleged failure that led to the model 206's recall differed from the alleged defect in the model 207. The Malcolms argue that "an ejection due to the defective open belt hook design in a model 206 is the same as one in a 207."

¶47 Evenflo representative Randolph Kiser testified that Evenflo had recalled the OMW model 206 due to its failure to conform to FMVSS 213. The District Court admitted letters between Evenflo and NHTSA that referred to the OMW model 206's failure to comply with the standards of FMVSS 213. The court also admitted videos of the OMW model 206 breaking apart during FMVSS 213 testing. The District Court allowed the Malcolms' expert D'Aulerio to testify regarding the cracks and other damage to the model 206 that had occurred during FMVSS 213 testing. The court further allowed the Malcolms to introduce D'Aulerio's "Test Failures" chart into evidence.

**Substantial Similarity**

¶48 Evenflo broadly asserts that "[i]t is generally improper in a products liability case to admit evidence regarding a product model other than the one at issue." The three out-of-jurisdiction cases that Evenflo cites do not support its sweeping assertion. The courts in each case excluded evidence of different product models due to lack of similarity.

¶49 For example, in *Brock v. Caterpillar, Inc.*, 94 F.3d 220 (6th Cir. 1996), Brock's expert testified that the Caterpillar D9H bulldozer's brake system was defective and unreasonably dangerous. *Brock*, 94 F.3d at 224. The trial court permitted the expert to base his opinion on a comparison with the allegedly improved braking system of the

20

newer and much larger model D10. *Brock*, 94 F.3d at 224-25. The Sixth Circuit Court of Appeals concluded that the trial court had committed prejudicial error on the grounds that the comparison between the two models at most was "tenuously relevant." *Brock*, 94 F.3d at 225.

¶50 The court recognized that evidence of product failures "of substantial similarity" would be "relevant and admissible." *Brock*, 94 F.3d at 224. The court highlighted the substantial differences between the Caterpillar model D9H and the model D10. *Brock*, 94 F.3d at 224-26. The court noted that "there were a large number of changes in character, size, style, and technological advancement between the manufacture design of the D9H . . . and that of the D10 some years later." *Brock*, 94 F.3d at 225. The court emphasized that Caterpillar had not manufactured the D10's allegedly superior braking system until well after the accident involving the D9H. *Brock*, 94 F.3d at 225.

¶51 The court in *McBurney Law Ser., Inc. v. Apex, Inc.*, 771 A.2d 911 (R.I. 2001), determined that the trial court had not abused its discretion when it refused to permit the plaintiffs to cross-examine a defense witness concerning test reports regarding two toaster products manufactured by the defendants different from the model at issue. *McBurney*, 771 A.2d at 912. The plaintiffs intended to use the reports to impeach the assertions of the defense's expert witness, made in response to plaintiffs' own questions, that these other models could not produce a relatively large fire. *McBurney*, 771 A.2d at 911. The court cited the fact that the toasters were different models with features that

21

varied from those in the toaster that the plaintiffs claimed had ignited the building fire. *McBurney*, 771 A.2d at 911-12.

¶52    Evenflo also points to *Blevins v. New Holland North America, Inc.*, 128 F. Supp. 2d 952, 960-61 (W.D. Va. 2001), in which the court granted the defendant's motion in limine to exclude evidence of prior accidents involving a different model hay baler than the model of baler at issue. The plaintiff sought to introduce the evidence in order to establish that New Holland had notice that baler operators tend to leave the operator's position without stopping the machine. *Blevins*, 128 F. Supp. 2d at 960. The court earlier had granted summary judgment to the defendant on the plaintiff's breach of warranty claim, "leaving for trial the claims based on negligence." *Blevins*, 128 F. Supp. 2d at 954. Montana's strict liability law, as we discussed, involves concepts that fundamentally are different than those that are relevant to negligence law. *See* ¶¶ 37-39.

¶53    Montana law generally allows evidence of similar incidents in product liability cases when the dispute involves similar products. *See Preston v. Montana Eighteenth Judicial Dist. Court, Gallatin County*, 282 Mont. 200, 936 P.2d 814 (1997). Preston suffered a head injury caused by an allegedly defective pneumatic roofing nailer. *Preston*, 282 Mont. at 202, 936 P.2d at 815. The district court denied Preston's attempt to seek discovery about various different product models that used the same allegedly faulty design. Preston filed a writ of supervisory control. *Preston*, 282 Mont. at 202-03, 936 P.2d at 815-16.

22

¶54 This Court reversed the district court's decision. The Court emphasized that this Court previously had recognized "that evidence of other injuries caused by similar products is relevant and admissible." *Preston*, 282 Mont. at 207, 936 P.2d at 818 (citing *Kuiper*, 207 Mont. at 56, 673 P.2d at 1219; *Krueger v. General Motors Corp.*, 240 Mont. 266, 274, 783 P.2d 1340, 1346 (1989)). The Court noted that a plaintiff in a product liability action must prove that the manufacturer sold the product in a "defective condition unreasonably dangerous to a user." *Preston*, 282 Mont. at 209, 936 P.2d at 819 (citing § 27-1-719(2), MCA). The Court recognized that "evidence of injuries caused by similar models would be relevant to both the 'defect' and the 'danger.'" *Preston*, 282 Mont. at 209, 936 P.2d at 819.

¶55 The Court further noted that in order to prevail on punitive damages, Preston would have to prove that the defendant had acted with indifference to the "high probability of injury to the plaintiff." *Preston*, 282 Mont. at 209, 936 P.2d at 819 (citing § 27-1-221(2), MCA). Evidence of injuries caused by similar models would be relevant to proving punitive damages as "the existence of similar injuries tends to demonstrate the manufacturer's knowledge of the 'high probability of injury.'" *Preston*, 282 Mont. at 209, 936 P.2d at 819. The Court added that "information of similar injuries caused by other models of nailers . . . would be relevant to the issues of whether the design was unreasonably dangerous, whether [the manufacturer] was aware of the danger, and whether [the manufacturer] was aware of a viable, alternative design." *Preston*, 282 Mont. at 209, 936 P.2d at 819.

23

¶56 Evenflo insists that "courts routinely exclude evidence regarding the recall of different models, especially where the recall involved a different defect." Evenflo again points solely to out-of-jurisdiction cases that fail to support its broad proposition. In *Lewy v. Remington Arms Co., Inc*., 836 F.2d 1104, 1108-09 (8th Cir. 1988), the Eighth Circuit reversed the trial court's decision to allow the plaintiff to introduce extensive evidence concerning the Remington model 600 rifle in a product liability action that involved the Remington model 700 rifle. The court acknowledged that the model 600 evidence would have been relevant if the model 600 had been "substantially similar in design and manufacture" to the model 700 with respect to the design defect at issue. *Lewy*, 836 F.2d at 1109. The court emphasized numerous differences between the two models with respect to the design defect at issue, however, and determined that the plaintiffs had not met their "burden of showing substantial similarity." *Lewy*, 836 F.2d at 1109.

¶57 The other cases cited by Evenflo emphasize the dissimilarity between product models or involve facts and procedural postures easily distinguishable from the Malcolms' case. *See Olson v. Ford Motor Co.*, 410 F. Supp. 2d 869 (D. N.D. 2006) (recall evidence not admissible where the recalls involved different and dissimilar models, different defects, and contrasting purposes for the recall); *Jordan v. General Motors Corp.*, 624 F. Supp. 72 (E.D. La. 1985) (evidence of recall campaign not relevant where the recall dealt with a different model year and a "distinctly different" defect). The Malcolms, by contrast, introduced evidence that the model 206 and 207 were

24

substantially similar with respect to the defects at issue. The evidence included the Malcolms' expert D'Aurelio's testimony that the OMW model 206 and 207 were "identical" with respect to the open belt hook design and the lack of EPS padding. Evenflo representative Kiser admitted that the seatbelt hook design was "pretty close" to absolutely identical. Kiser also admitted that a risk existed that the belt hooks could fail and allow the seat to slip off the seatbelt of any OMW models, including the 207.

¶58 The District Court acted within its discretion when it determined that the model 206 and model 207 were substantially similar with respect to the design defects alleged by the Malcolms. *Sunburst*, ¶ 74. The substantial similarity between the two models dictates that evidence regarding the model 206 would be relevant to whether Evenflo had sold the model 207 to the Malcolms in a "defective condition unreasonably dangerous to a user." Section 27-1-719(2), MCA. Evidence of cracks, shearing of belt hooks, and FMVSS 213 test failures of the model 206 "would be relevant to both the 'defect' and the 'danger.'" *Preston*, 282 Mont. at 209, 936 P.2d at 819. The District Court acted within its discretion when it decided that evidence regarding the model 206 constituted relevant evidence in determining Evenflo's liability for compensatory damages. *Sunburst*, ¶ 74.

¶59 The District Court also determined that evidence of Evenflo's actions surrounding the 1995 recall would be relevant for the purpose of the Malcolms' punitive damages claim. Evenflo repeatedly argues that evidence of the 1995 recall of the OMW model 206 should be inadmissible as the Malcolms' alleged defect in the model 207 "differ[s] from the problem that prompted the Model 206's recall." Evenflo claims that "cracking in

25

some shells" constituted "the sole basis" for the 1995 recall of the model 206. Evenflo claims that the Malcolms "incorrectly imply that the Model 206 was recalled because of its open belt hook design. If the belt hook design had triggered the recall, NHTSA never would have allowed Evenflo to sell the Model 207." Evenflo argues that "[t]he proof is in the pudding. Unlike the Model 206, the Model 207 complies with FMVSS 213—a fact the jury never heard."

¶60 Evenflo's argument disregards the Malcolms' evidence that the model 206 contained the same defects as the model 207. *See* ¶ 57. Evenflo represented to NHTSA and consumers that "cracking in some shells" and a "cut and pinch" hazard constituted the sole reason for the recall of the model 206. The Malcolms presented evidence, however, that Evenflo knew from test results and test videotapes that the breaking apart of the seat in the area of the vehicle seat belt path and the resulting loss of restraint of the child seat constituted the true hazard of the model 206. Evenflo ignores the fact that this incomplete representation to NHTSA formed a major basis of the Malcolms' punitive damages claim.

¶61 The District Court noted in its order denying Evenflo's motion for a new trial that Evenflo had used evidence of its "cooperation and interaction with the NHTSA" in connection with its 1995 "consumer corrective action" involving the OMW model 206 to argue against liability for punitive damages. The District Court correctly observed that the Malcolms had "used this same evidence to show . . . how Evenflo lied to NHTSA, the public and even Jessi Malcolm about how badly the [OMW] was breaking apart, and the

26

true ejection hazards posed to children riding in safety seats with open belt hooks." The court further determined that "Evenflo's so-called 'fix' incorporated into the model 207 did nothing to eliminate the ejection hazard posed by the open belt hook design."

¶62 Evenflo claims that "[t]he Malcolm case is the only case involving an allegation that the belt hook of a Model 207 broke and caused death or serious injury to a child. It is also the only known case of a child being ejected from a vehicle while in a Model 207." Evenflo's claim ignores the reports that it received of OMW model 207 belt hooks breaking off, releasing from the vehicle seat belt, with the baby and seat bouncing around in the passenger compartment. *See* ¶¶ 14-16. Evenflo made the same assertion in its cross-examination of D'Aulerio. D'Aulerio replied that it was "a miracle" that the babies involved in the other accidents had not been injured.

¶63 Evenflo's conduct surrounding the testing and recall of the model 206 constituted relevant evidence regarding Evenflo's state of mind with respect to its sale of the model 207. *Sunburst*, ¶ 81. Evenflo's state of mind represented a key element in determining whether Evenflo had acted with actual fraud or actual malice. *Sunburst*, ¶ 81; § 27-1-221, MCA. The District Court acted within its discretion when it determined that evidence surrounding the recall and testing of the OMW model 206 was relevant for the purposes of determining punitive damages. *Sunburst*, ¶ 74.

¶64 *Did the District Court abuse its discretion by applying unfairly its FMVSS 213 evidentiary ruling with respect to compensatory damages?*

¶65 Evenflo argues that the District Court abused its discretion by applying its FMVSS

213 rulings "in a one-sided manner." Evenflo points to the court's rulings that allowed the Malcolms to present evidence regarding the OMW's test "failures," the recall of the model 206 due to noncompliance with FMVSS 213, and the alternative "tunnel" design's perfect FMVSS 213 test success. Evenflo contends that fairness dictates that the court should have allowed Evenflo to inform the jury that the model 207 had "passed" FMVSS 213, "which distinguished it from its recalled predecessor Model 206."

**Test Failures**

¶66 Evenflo and the Malcolms have engaged in semantic arguments throughout trial and on appeal regarding the difference between "compliance" with FMVSS 213 test standards and OMW "failures" that occurred during FMVSS 213 testing. The Malcolms use the word "failure" in an informal sense to describe cracks, rips, tears, and other malfunctions that they argue constitute a defect and evidence of an impending failure of the shell. Evenflo equates any mention of the word "failure" with a "pass" or "fail" of the official standards of FMVSS 213.

¶67 The Malcolms raised the issue of the OMW's test "failures" in their opening statement. The Malcolms referred to sled testing conducted by government agencies, Evenflo, and Consumer Reports that showed cracks on the OMW shell and a tendency for the belt hook to break under stress. The Malcolms claimed that the OMW had been tested 582 times, with 157 "failures." Evenflo argued in chambers that the court should have allowed it to inform the jury that "the testing agency that was running this test deemed the result a pass." The Malcolms responded that they were referring to "cracks,

28

rips, and tears . . . failures in the shell," rather than any "failure" of the test standard as determined by any governmental agency.

¶68 The Malcolms' expert D'Aulerio testified that he had reviewed 582 tests performed on Evenflo OMW child seats. D'Aulerio found 157 tests where "there was some kind of problem, either a fracture or a crack, or a break, in some instances a total complete fracture of the belt hook . . . . It worked out to be, like, twenty-seven percent of the tests." The tests included the model 206, model 207, and prototypes of both models. D'Aulerio testified that the tests were "a big huge red flag" that indicated a defect in the OMW. Evenflo contends that "[t]he jurors who heard that testimony could only have believed that the Model 207 regularly failed in testing."

¶69 The District Court also allowed the Malcolms to introduce into evidence as Exhibit 278-A D'Aulerio's 11-page "test failures" chart. *See* ¶ 25. The court denied Evenflo's motion to introduce the underlying test reports pursuant to the rule of completeness. Evenflo argues that Malcolms' opening and closing arguments "served to ensure that the jury would gather from D'Aulerio's testimony and his 'test failures' chart that Evenflo's Model 207 seats had failed in testing."

¶70 Evenflo further points to Evenflo representative Randolph Kiser's testimony on cross-examination. Kiser testified that Evenflo had recalled the OMW model 206 due to its failure to conform to FMVSS 213. Evenflo contends that Kiser's testimony left the jury with the false impression that the model 207 also must have failed tests. The Malcolms also elicited testimony from Kiser that the Malcolms' superior alternative

29

tunnel design never had failed in testing. Evenflo argued that the court should have allowed it to introduce evidence that the model 207 likewise never had failed in testing even without the tunnel design.

¶71 Counsel for the Malcolms also referred to test "failures" in his closing argument. For example, counsel for the Malcolms made the following statement:

> Ladies and gentlemen, Exhibit 278-A, that is the list, the chronological list, of all the testing. And you can look for yourself and see the dates of the tests, and you can see the descriptions that Evenflo actually had as to the nature of these cracks. There was a lot of seats, after production started up in late July of 1995. Dozens, and dozens, and dozens of seats in which there were cracks of varying degrees and magnitude in this seat. Now, the crack, itself, doesn't mean the child is going to get killed, but what it is is it's notice that your margin of safety in this design is so thin that you're getting cracks at these speeds. What's going to happen if you are involved in a higher speed impact?

Exhibit 278-A lists the "test failures" compiled by D'Aurelio. Counsel for the Malcolms continued throughout their closing to press the point that Evenflo knew about the design defects from its tests. Counsel argued that "Evenflo knew about it. They knew about it from its tests."

¶72 Although the District Court did not allow Evenflo to state specifically that the OMW model 207 had passed FMVSS 213, the court did allow Evenflo some latitude. Evenflo informed the jury in its opening statement that the testing that resulted in the recall involved only the model 206. Evenflo explained that it had changed the OMW before it produced the model 207. Evenflo argued that the "tests don't tell you anything, at all, about either the Malcolm accident or the Malcolm seat. This wasn't even the same

30

model seat." Evenflo went on to state that the production model 207 "was tested another 320 times by NHTSA, by the Canadian Government, by Evenflo, by independent labs, and it passed every test. Every test, it passed." Evenflo argued that the Malcolms' expert D'Aulerio was "the only person that's going to testify that . . . the Canadians, they got it wrong, NHTSA got it wrong, the independent labs got it wrong, the car seats didn't really pass those tests." Evenflo reiterated that "[t]here is not one testing agency that has found that the 207 did not pass the test."

¶73 Evenflo representative Kiser testified that the OMW model 207 never was recalled, "[un]like the 206." Kiser stated that "[not] one single video" showed the model 207 breaking apart like the model 206. Kiser testified at length regarding the engineering changes that Evenflo had made to the OMW after the model 206 recall. Kiser pointed out that D'Aulerio had counted "failures" in model 206 seats and prototype seats in his "test failures" chart. Kiser further testified that the NHTSA had conducted 22 tests on the model 207 and had not observed any cracks or any problems with the belt hooks.

¶74 Evenflo witness William Van Arsdell, an engineer and design expert, also testified at trial. Evenflo's counsel distinguished the OMW model 207 and the model 206 at the beginning of Van Arsdell's testimony. Van Arsdell opined that the Malcolms' OMW model 207 child seat was "not defective in any way." Van Arsdell testified that he had conducted rollover crash tests of the OMW model 207 and that the belt hooks had not broken or sustained any damage. Van Arsdell testified that, after reviewing "all [of] the sled tests," he believed the model 207 to be "a different seat" than the model 206. Van

Arsdell distinguished between the cracks and fractures that occurred in the model 206 during sled testing and the cracks in the Malcolms' model 207. Van Arsdell testified that not one sled test showed damage to the belt hook of the model 207.

¶75 Van Arsdell also testified that the OMW's open belt hook design provided advantages over the Malcolms' alternative "tunnel" design and the same level of safety. Van Arsdell suggested that the open belt hook design was more convenient than the "tunnel" design. Van Arsdell added that the open belt hook design "promotes easy proper use," and that "if you don't use [child seats] properly, they probably can't do you much good." Van Arsdell noted that he was not aware of anyone aside from the Malcolms' expert D'Aulerio who had criticized the open belt hook design.

¶76 Evenflo repeatedly tested the boundaries of the District Court's FMVSS 213 ruling. The District Court sustained the Malcolms' objection after Evenflo's counsel asked D'Aulerio "you're the only one that's been critical of those test results?" Evenflo's counsel, undeterred, drew further objection for inquiries such as "you know that NHTSA has specifically tested the model 207, that's at question here?" and "[y]ou can't sell a child restraint system until NHTSA has deemed it safe and effective, right?" The Malcolms' objection cut short a similar attempt to circumvent the court's order in limine in Evenflo's closing argument: "[t]his product is regulated by the United States government, by the Canadian government, it's been tested by both governments, by the independent labs. And every lab that man mentioned, has tested this, this 207, and not one lab---"

¶77    The record does not support Evenflo's claim that the District Court unfairly precluded it from distinguishing the OMW model 207 from the OMW model 206 and from presenting evidence that the model 207 was not defective.   Evenflo attempts to bolster its case by again arguing that "[t]he disparate treatment of FMVSS evidence is most obvious if one considers the very predicate for the recall of Model 206.   That predicate was the FMVSS 213 testing, which showed cracking in some shells.   That's the sole basis for the recall."   It is true that the cracking of the shells constituted the official reason for the recall.   Evenflo ignores the Malcolms' evidence that Evenflo did not inform NHTSA fully of all the defects in the OMW model 206 during the recall process.

**Completeness Rule**

¶78    Evenflo further argues that the District Court violated the "completeness rule" in M. R. Evid. 106, when it denied Evenflo's request to introduce the test reports underlying D'Aulerio's "test failures" chart that the court had admitted as exhibit 278-A.  *See* ¶ 25. Evenflo contends that D'Aulerio's chart "quoted selectively and misleadingly from FMVSS 213 test reports."   Evenflo cited to Rule 106 in its cross-examination of D'Aulerio when it offered into evidence the FMVSS 213 test reports from which D'Aulerio collected Evenflo's quotes regarding cracks in the OMW shell.   The test reports showed that many of the OMWs had complied with FMVSS 213 despite the cracks and fractures.   The District Court denied Evenflo's request on the grounds that the evidence was "more prejudicial than probative . . . [t]he testimony goes to the shell, and I don't think the rest of the results are relevant to this proceeding."

33

¶79 Montana's "completeness rule" provides that when a party introduces part of a writing, an adverse party may require the introduction at that time of any other part of the writing "which ought in fairness be considered at that time." M. R. Evid. 106(a)(1). The adverse party also "may inquire into or introduce any other part of such item of evidence" in the party's own case. M. R. Evid. 106(a)(2). Evenflo argues that the District Court did not have discretion to deny the evidence because "a fairness test is not built into Subpart (a)(2)."

¶80 The Commission Comments to Rule 106 emphasize that the "trial court makes the final determination of how much evidence is needed to make a fair impression under this rule and to prevent abuses of the rule." The Commission Comments note that the trial court's authority arises from M. R. Evid. 403, "allowing the exclusion of relevant evidence on the grounds of prejudice," and M. R. Evid. 611, "allowing the court the authority to conduct trial." M. R. Evid. 106, Commission Comments, MCA 2008 Annot., Vol. 5, p. 199. The Commission Comments apply to both subpart (a) and (b).

¶81 Evenflo's Rule 106 argument merely constitutes a different strategy to introduce the prohibited evidence of the OMW model 207's compliance with FMVSS 213. We have decided that the District Court did not abuse its discretion when it determined that even if Evenflo's compliance with FMVSS 213's "minimal standards" would be relevant, the evidence would be more prejudicial than probative and might tend to mislead or confuse the jury. *See* ¶ 44. The District Court also did not abuse its discretion when it

denied Evenflo's attempt to introduce that same evidence pursuant to Rule 106. *Sunburst*, ¶ 74.

**Improper Legal Maneuvering**

¶82 Evenflo points to *Hall v. Big Sky Lumber & Supply, Inc.*, 261 Mont. 328, 863 P.2d 389 (1993), to support its argument that the Malcolms' counsel committed improper legal maneuvering in his closing argument. Hall filed a tort suit against the driver of a logging truck after the logging truck struck his vehicle from behind when its brakes failed. *Hall*, 261 Mont. at 331, 863 P.2d at 391. A highway patrolman issued the driver a citation at the scene for "inadequate or defective brakes." *Hall*, 261 Mont. at 336, 863 P.2d at 394. The district court granted the defendant's motion in limine to exclude evidence of the citation. *Hall*, 261 Mont. at 336, 863 P.2d at 394-95. The defendant's counsel stated during his closing argument that "if there were any defects or problems with that braking system at all, you can be sure that [one of the patrolman witnesses] would have told you about that." *Hall*, 261 Mont. at 336-37, 863 P.2d at 395.

¶83 The jury found that the defendant was not negligent. *Hall*, 261 Mont. at 332, 863 P.2d at 392. This Court ordered a new trial. *Hall*, 261 Mont. at 337, 863 P.2d at 395. The Court concluded that the "argument by defense counsel to the jury [was] improper legal maneuvering. Defense counsel cannot ask to have evidence excluded and then argue that if the evidence existed it would have been admitted." *Hall*, 261 Mont. at 337, 863 P.2d at 395.

¶84 Evenflo claims that the Malcolms "engaged in just such improper legal maneuvering here." Evenflo argues that the District Court committed "transparent reversible error" when it allowed the Malcolms' counsel to state that "'if there were any inaccuracy' in D'Aulerio's chart, Evenflo would have said so." Evenflo selectively parses the record. Evenflo stated in its closing argument:

> [H]e tells you, please, look at Exhibit 278-A, that's the list put together by Dr. D'Aulerio that he made from the test reports. Why not put the test reports in? I mean, that's where it came from, why not use your best evidence? I mean, think of all of this key evidence that you're really not seeing, the door, actual test reports.

The Malcolms' counsel then stated in rebuttal:

> [Evenflo's counsel] held it up, and it's the exhibit prepared by Mr. D'Aulerio that has the tests, 278-A. And he said, well, where are the actual tests? Well, this is the summary. It would not have been admitted if it were not an accurate summary. And as Mr. D'Aulerio said, the words that are written, here, shell cracked on the left side starting at the belt hooks, are the words that were actually on the tests. That's what it said. And I can assure you that if there were any inaccuracy in these 157 tests included in this summary---.

The Court overruled Evenflo's objection. The Malcolms' counsel continued:

> I can assure you that if there were any inaccuracy about the cracks that are shown, here, that would have been pointed out. He would have been impeached on it. They would [have] said you inaccurately quoted this.

¶85 The defendant in *Hall* asked the court to exclude the evidence and then took advantage of the plaintiff's inability to mention the evidence by implying that the evidence did not exist. *Hall*, 261 Mont. at 336-37, 863 P.2d at 395. The Malcolms, on the other hand, responded to Evenflo's implication that the actual test reports differed

36

from those presented on the summary. The District Court's order in limine prohibited the admission of the underlying test reports that Evenflo had mentioned in its closing argument. The Malcolms' counsel referred to the summary of quotes that the court had deemed to be admissible. The Malcolms' counsel did not commit improper legal maneuvering in his closing argument.

¶86 We agree that several of the District Court's evidentiary rulings heightened the task of Evenflo's defense. The District Court's rulings regarding Kiser's and D'Aulerio's testimony and D'Aulerio's "test failures" chart left Evenflo with a difficult task. The court's exclusion of Evenflo's FMVSS 213 compliance information made that task even more onerous.

¶87 The District Court operated within the realm of Montana's strict liability law, however, which places a heavy burden on the manufacturer of products. *See, e.g.*, *Sternhagen*, 282 Mont. at 177-78, 935 P.2d at 1144-45. Montana's strict liability law emphasizes maximum protection for the consumer and places the risk of loss on the manufacturer. *Sternhagen*, 282 Mont. at 175-81, 935 P.2d at 1143-46. Montana's strict liability law rejects concepts fundamental to negligence law such as reasonableness and foreseeability. *Sternhagen*, 282 Mont. at 176, 935 P.2d at 1144.

¶88 We cannot say that the District Court's rulings were improper with regard to Evenflo's liability for compensatory damages when we view those rulings through the lens of Montana's strict liability law. We will overturn a district court's evidentiary rulings only if the court abused its "broad discretion." *Sunburst*, ¶ 74. The record does

37

not indicate that the court acted arbitrarily without conscientious judgment or so exceeded the bounds of reason as to work a substantial injustice. *Giddings*, ¶ 42. We cannot say based on this record that the court abused that discretion by applying unfairly its FMVSS 213 ruling. *Giddings*, ¶ 42.

¶89 *Did the District Court abuse its discretion when it excluded Evenflo's FMVSS 213 compliance evidence with respect to punitive damages?*

¶90 A jury may award punitive damages when a defendant has acted with actual fraud or actual malice. Section 27-1-221, MCA. The defendant's state of mind represents a key element in determining whether a defendant acted with actual fraud or actual malice. *Sunburst*, ¶ 81. Evenflo argues that the District Court's decision to exclude evidence of the OMW model 207's compliance with FMVSS 213 prevented it from introducing evidence bearing on its state of mind. Evenflo contends that this Court's decision in *Sunburst*, which we decided after the Malcolm trial, requires reversal of the jury's punitive damages award.

¶91 In *Sunburst*, Texaco operated a gasoline refinery just outside the town of Sunburst, Montana, from 1924 to 1961. Gasoline leaked from pipes at the refinery for many years and contaminated the surrounding soil. Texaco conducted a partial cleanup of the contamination in the soil and the groundwater in the late 1950s, but left a significant amount of pollution. *Sunburst*, ¶ 10. Montana's Department of Environmental Quality (DEQ) eventually assumed jurisdiction over the refinery site. *Sunburst*, ¶ 11.

38

¶92    Sunburst filed suit against Texaco on February 22, 2001. Sunburst alleged numerous causes of action, including strict liability for abnormally dangerous activity. *Sunburst*, ¶ 19. The district court denied Texaco's attempt to introduce evidence that it had cooperated with DEQ and that it had complied with DEQ regulations during its remediation efforts in the decade before Sunburst had filed suit. *Sunburst*, ¶ 81. The district court determined that evidence of Texaco's negotiations with DEQ likely would confuse the jury and divert its attention from evaluation of Sunburst's common law claims. *Sunburst*, ¶ 83. The jury awarded Sunburst compensatory damages of approximately $16 million. *Sunburst*, ¶ 24. The jury also found that Texaco had acted with actual fraud or actual malice and awarded Sunburst $25 million in punitive damages. *Sunburst*, ¶ 26.

¶93    We concluded that the district court had abused its discretion by prohibiting Texaco from introducing evidence at trial of DEQ's involvement in the site remediation and Texaco's attempted compliance with government regulations. *Sunburst*, ¶ 85. We stated that a good faith effort to comply with all government regulations "would be evidence of conduct inconsistent with the mental state requisite for punitive damages." *Sunburst*, ¶ 81.

¶94    The District Court concluded that the OMW model 207's compliance with FMVSS 213 had "absolutely no bearing at all upon the reprehensibility of the conduct of Evenflo." The court emphasized that Evenflo could not even begin selling the OMW without complying with FMVSS 213 and thus "[e]ach and every act of Evenflo relating

39

to it[s] adherence to FMVSS 213 was intended solely to free the company up to sell, and profit from, the On My Way."

¶95    We faced similar findings regarding the defendant's misconduct in *Sunburst*. The district court noted that Texaco had been communicating with the public regarding the contamination since the late 1980's. *Sunburst*, ¶ 82. The court found that Texaco's communication with the public "consistently [had] minimized the problem and failed to accurately report their findings." *Sunburst*, ¶ 82. The court attributed this effort at minimization to the fact that Texaco had been motivated by its "own financial interests." *Sunburst*, ¶ 82. The court highlighted a 1989 document that outlined Texaco's "hidden agenda" to save money at the expense of a meaningful cleanup in Sunburst. The court further attributed to Texaco "numerous affirmative misrepresentations concerning the pollution in Sunburst." *Sunburst*, ¶ 82.

¶96    We determined that the district court's partial reliance on these findings of misconduct by Texaco to justify an award of punitive damages could not be sustained in light of the court's decision to exclude "evidence tending to show why the defendant acted as it did, or failed to act, whatever the case may be, when a jury considers whether to award punitive damages." *Sunburst*, ¶ 84. The evidence could bear on whether Texaco had acted with "deliberate indifference," whether Texaco knowingly had concealed any material facts, and the size of any appropriate punitive award. *Sunburst*, ¶ 84. Sunburst retained a strong argument that Texaco's inaction and selection of the cheap remediation alternative indeed had demonstrated "deliberate indifference," but "the

40

debate should not be preempted by disabling Texaco from explaining itself." *Sunburst*, ¶ 84.

¶97 The District Court's order upholding the jury's award of punitive damages to the Malcolms likewise included a number of findings of fact regarding misconduct by Evenflo. The District Court found that Evenflo had known "from the outset" that it could have used the safer alternative tunnel design for the OMW. The court found that the tunnel design would have provided "a substantial margin of safety" versus the open belt hook design and would have "virtually eliminate[d] the deadly risk of a loss of restraint during an accident." The court found that Evenflo had deemed acceptable manufacturing the OMW with an unpadded, hard plastic surface, despite its knowledge that adding EPS foam padding would reduce the potentially deadly hazard of skull fractures.

¶98 The District Court further found that Evenflo had concealed from NHTSA the "true hazard [of] potentially deadly ejection" associated with the OMW during its June 1995 "consumer corrective action." The court stated that Evenflo had failed to remedy sufficiently the hazard before re-starting production, and had continued to withhold its knowledge that the OMW "continued to crack, tear, or peel back in the area of the automobile seat belt path at a rate that was dangerously high." The court noted that despite Evenflo's knowledge of the hazards associated with the OMW, it had assured Jessica Malcolm that the seat was "safe to use" with her soon to be born child.

¶99 We cannot sustain the District Court's partial reliance on these findings of misconduct by Evenflo in light of the court's decision to exclude evidence that might

41

show why Evenflo "acted as it did, or failed to act, whatever the case may be, when the jury consider[ed] whether to award punitive damages." *Sunburst*, ¶ 84. Evidence of Evenflo's good faith effort to comply with all government regulations, including FMVSS 213, "would be evidence of conduct inconsistent with the mental state requisite for punitive damages." *Sunburst*, ¶ 81.

¶100 The District Court attempted to distinguish *Sunburst* on the grounds that compliance with "the minimal frontal impact standard" established by FMVSS 213 was "irrelevant" and "inadmissible." We agree that evidence of the OMW model 207's compliance with FMVSS 213 was not relevant to the issue of compensatory damages. *See* ¶ 44. We cannot agree with the District Court that the FMVSS 213 compliance evidence would not be relevant to the issue of punitive damages. Evenflo may have been able to persuade the jury that its compliance with FMVSS 213 showed that it had not evinced "deliberate indifference" to the welfare of the occupants of the OMW. *Sunburst*, ¶ 84. The jury also might have decided that evidence of Evenflo's misconduct demonstrated "deliberate indifference," but the District Court "should not have preempted that debate by disabling [Evenflo] from explaining itself." *Sunburst*, ¶ 84.

¶101 The District Court abused its discretion by prohibiting Evenflo from introducing evidence of the OMW model 207's compliance with FMVSS 213 for the purposes of considering the appropriateness of punitive damages. *Sunburst*, ¶ 74. We vacate the jury's award of $3.7 million in punitive damages. The question of punitive damages

must be put again to a jury with Evenflo being allowed to present evidence of the OMW model 207's compliance with FMVSS 213.

¶102  As we recognized in *Sunburst*, ¶ 86, this decision raises the problem of how the District Court could have ensured that the jury considered the OMW model 207's compliance with FMVSS 213 for purposes of punitive damages, but disregarded the same evidence for the purposes of compensatory damages.  The District Court noted that "the dilemma is a thorny one" and opined that "dilemmas such as this are unwelcome in jury trials."

¶103  We recognize the difficulties highlighted by the District Court in conducting a jury trial.  We also recognize, however, that our system provides for the presentation of evidence regarding liability for compensatory damages and punitive damages to the jury in a single proceeding.  *See Finstad v. W.R. Grace & Co.*, 2000 MT 228, ¶ 20, 301 Mont. 240, 8 P.3d 778; *First Sec. Bank of Glendive v. Gary*, 245 Mont. 394, 401, 798 P.2d 523, 527 (1990); § 27-1-221(6)-(7).  We must trust that the jury will heed the court's instructions as to how to evaluate the evidence presented.  *See e.g. Murray v. Talmage*, 2006 MT 340, ¶ 17, 335 Mont. 155, 151 P.3d 49.  We need not put our reliance to the test here.  The District Court excluded evidence of the OMW model 207's compliance with FMVSS 213 for both purposes.  We affirmed the District Court's decision for the purposes of compensatory damages.  *See* ¶ 44. A new jury may consider evidence of the OMW model 207's compliance with FMVSS 213 for the purposes of determining whether Evenflo acted with actual fraud or actual malice.  Section 27-1-221, MCA.

43

¶104   We affirm in part, reverse in part, and remand for further proceedings.


/S/ BRIAN MORRIS


We Concur:


/S/ MIKE McGRATH
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER


Chief Justice Mike McGrath, specially concurring.

¶105   While I concur with the majority opinion, I also agree with the suggestions in Justice Nelson's dissent regarding the bifurcation of jury trials involving punitive damages claims.  As noted, the Court has now twice concluded that it is appropriate to exclude evidence relevant to punitive damages from consideration by the jury deciding liability and compensatory damages.

¶106   Punitive damage claims involve special issues, but liability for punitive damages must be determined by the same trier of fact.  Section 27-1-221(6), MCA.  Clearly the evidence of testing results excluded in the court below, like the evidence of negotiations with DEQ excluded in *Sunburst*, should be heard by the jury deciding punitive damages to ensure fairness to a party defending allegations of actual fraud or malice.

¶107 Montana law provides for a bifurcated process for jurors to assess the amount of punitive damages. Section 27-1-221(7), MCA. In the future, trial courts should consider bifurcating liability issues from punitive damages issues. In situations involving similar conflicting evidence, it may be appropriate for the jury to address all of the issues regarding punitive damages following the trial on liability.

¶108 Trying these issues to the same jury panel will not necessarily lead to confusion or cast an undue burden on the district court or the jury. Appropriate instructions can be fashioned to address these concerns. Our courts have a history of using innovative techniques to assure fair trials in special situations. *See e.g. State v. Jenkins*, 285 Mont. 131, 948 P.2d 204 (1997) and *State v. Lawrence*, 285 Mont. 140, 948 P.2d 186 (1997) (criminal charges tried against two individuals simultaneously to two juries).

¶109 Trial courts should consider innovative solutions in cases like the one at bar to provide a fair trial to all parties.

/S/ MIKE McGRATH

Justice Jim Rice, concurring in part and dissenting in part.

¶110 I concur with the Court's decision to reverse on the punitive damages issue, but I would likewise reverse on the issue of compensatory damages, because the District Court's evidentiary rulings permitted the Malcolms to make unfair use of the FMVSS 213 test results—the very same use which the District Court prohibited by Evenflo.

45

¶111 I agree with the Court's analysis distinguishing between products liability and negligence claims, and agree that evidence regarding the manufacturer's compliance with applicable regulations should not be generally admissible in products liability cases, as such evidence would improperly inject principles of negligence law, such as reasonableness and level of care, into a "strict" liability matter. Accordingly, I concur with the Court's rejection of Section 4(b) of the Restatement (Third) of Torts.

¶112 I further agree that the demonstrable observations and findings from the FMVSS 213 testing of models 206 and 207 were relevant and admissible in this case, such as cracks, rips and tears in the seat shell, belt hook breakage under stress, and such outcomes. The Malcolms laid a sufficient foundation to show that the 206 and 207 models were substantially similar, and the District Court did not abuse its discretion by determining that the information would be relevant to determining Evenflo's liability. Opinion, ¶ 57. And, as against such observations and findings, the District Court properly denied Evenflo's effort to introduce evidence that the OMW seat had actually "passed," or received a passing result on, the FMVSS 213 testing. Such an over-generalized response by Evenflo would have been irrelevant or overly prejudicial to the Malcolms.

¶113 However, the District Court did not require the Malcolms to stop there. The District Court did not limit Malcolms to introducing evidence of the product stresses, as listed above, which occurred during testing. Rather, the court allowed Malcolms to *characterize* these findings in a manner favorable to their case, permitting Malcolms to

46

repeatedly tell the jury that the OMW seat had "failed" the testing. Then, the court denied Evenflo's effort to counter this characterization by introducing evidence that the OMW seat had, in fact, "passed" the testing. From Malcolms' one-sided characterization of the testing, the jury took to deliberations a simple, powerful, yet fundamentally untrue proposition: that the OMW seat had "failed" mandatory testing. While the efficacy of the FMVSS 213 testing can certainly be debated, nonetheless, the truth is, the OMW seat had actually passed that testing. The District Court later reasoned that the testing results had "nothing to do" with the particular design issues in this case, but, if that was true, then the court should not have allowed Malcolms to introduce evidence that Evenflo had "failed" the testing.

¶114 Thus, the District Court inflicted upon Evenflo the very prejudice from which it had protected Malcolms. But, the District Court went even further. After permitting Malcolms to introduce oral and written evidence using the over-generalized and prejudicial term "test failures," and denying a response by Evenflo to that characterization, the court then permitted Malcolms to argue to the jury, over Evenflo's objection, that *Evenflo had failed to offer evidence to the contrary.* This was untrue, and the District Court thus permitted Malcolms to make an unfair argument.

¶115 Evenflo attempted to squeeze a couple references to "passing" the tests into the trial, but was not permitted to actually offer that evidence or argue it. As the Court acknowledges and describes, the District Court's evidentiary rulings "impeded" Evenflo's defense, "left Evenflo with a difficult task," and made Evenflo's burden "even

47

more onerous." Opinion, ¶ 86. Nonetheless, the Court dismisses Evenflo's arguments, concluding the rulings were proper when viewed "through the lens of Montana's strict liability law." The Court thus justifies the unfairness of the District Court's evidentiary rulings by citing to the unique nature of products liability law. However, though a manufacturer in a product case indeed carries a heavy burden, the trial must still be conducted fairly and evenhandedly, and the rules of evidence applied justly. Here, they were not. There cannot be one set of evidentiary rules for a plaintiff, and a different set of rules for a defendant, even in a products liability case. Montana Rule of Evidence 106 and the related 'completeness doctrine' permit the opposing party to introduce the other part of the evidence "if it is needed to make the primary evidence understandable." *State v. Elliott*, 2002 MT 26, ¶ 65, 308 Mont. 227, 43 P.3d 279 (citation omitted). The District Court unfairly prejudiced Evenflo by allowing the Malcolms to characterize the test results as "failures" without permitting Evenflo to offer the other side of the story. *See* Mont. R. Evid. 403; *Hall v. Big Sky Lumber & Supply*, 261 Mont. 328, 853 P.2d 389 (1993). I thus agree with Evenflo's argument that the District Court's ruling on the FMVSS 213 testing was not fairly applied.

¶116 I would reverse for a new trial on both compensatory and punitive damages.

/S/ JIM RICE

Justice James C. Nelson, concurring in part and dissenting in part.

¶117 I concur in the Court's Opinion as to Issues 1, 2, and 3 but dissent as to Issue 4.

48

¶118 At the outset, I note that this is the second time in as many years that this Court has stripped plaintiffs of hard-earned and well-deserved jury awards of punitive damages. With today's decision, as with its predecessor (*Sunburst School Dist. No. 2 v. Texaco, Inc.*, 2007 MT 183, 338 Mont. 259, 165 P.3d 1079), this Court imposes conflicting evidentiary rules regarding proof of compliance with minimum government standards: such evidence is not admissible regarding liability for compensatory damages but is admissible regarding liability for punitive damages. At best, this approach forces jurors into needless and infeasible mental gymnastics. At worst, as in *Sunburst*, this approach forces the Malcolms to retry their entire case to a different jury, with the concomitant waste of time, money, and resources to the civil justice system—a "dilemma" left unresolved in *Sunburst* and unresolved here. *See Sunburst*, ¶ 86; Opinion, ¶¶ 102-103.

¶119 Moreover, the Court's approach provides the camel's nose in the tent for corporations, such as Evenflo, which ask this Court (and, presumably, the Legislature) to abrogate well-settled, decades-old principles of Montana strict liability law[1] in favor of the controversial *Restatement (Third) of Torts: Products Liability* § 4(b), which makes admissible in defective design and inadequate instructions/warnings cases the product's compliance with an applicable product safety statute or administrative regulation.

---

[1] *See Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 162 Mont. 506, 513 P.2d 268 (1973) (adopting *Restatement (Second) of Torts* § 402A (1965)); *Brown v. North Am. Mfg. Co.*, 176 Mont. 98, 576 P.2d 711 (1978); *Kuiper v. Goodyear Tire & Rubber Co.*, 207 Mont. 37, 673 P.2d 1208 (1983); *Lutz v. National Crane Corp.*, 267 Mont. 368, 884 P.2d 455 (1994); *Sternhagen v. Dow Co.*, 282 Mont. 168, 935 P.2d 1139 (1997); § 27-1-719, MCA.

Although the Court claims to reject § 4(b), Opinion, ¶ 39, the Court for all practical purposes does exactly the opposite by allowing evidence of compliance with minimum government standards to be introduced for purposes of punitive liability during the very *same* proceeding in which the jury considers the preliminary question of whether the defendant is liable for the alleged tort, Opinion, ¶¶ 102-103. The Court asserts that we "must trust that the jury will heed the court's instructions as to how to evaluate the evidence presented." Opinion, ¶ 103. In other words, we must trust that the jurors will somehow put the compliance evidence completely out of their minds for purposes of tort liability and compensatory damages. Yet, it is precisely because we cannot rely on the jury to parse evidence in this manner that we require evidence of the defendant's financial worth to be presented in a separate proceeding. *See* § 27-1-221(7)(a), MCA. While the Court purportedly "slams the door" on the camel's nose, Opinion, ¶ 40, the fact is that before *Sunburst* and today's decision, this Court had barred the camel completely from the tent. Predictably, his bruised nose notwithstanding, once the camel has had a whiff, he will return in more earnest.

¶120 Bottom line, the Court's approach will continue detrimentally to impact the victims of toxic torts, those injured by negligent conduct, and, as here, individuals and families devastated by injury and death caused by dangerous and defective products placed into the stream of commerce by corporations whose focus is on self-aggrandizement rather than the health, safety, and welfare of the consumer.

¶121 I disagree with the Court's decision to vacate the Malcolms' punitive damages award and remand this case to the District Court for a retrial just so that Evenflo can present evidence of its purported "good faith" compliance with Federal Motor Vehicle Safety Standard 213 (FMVSS 213). Evenflo has failed to demonstrate that the District Court abused its discretion in excluding this evidence, and Evenflo has failed to demonstrate that it was prejudiced as a result of the court's ruling.

**No Prejudice**

¶122 Addressing the latter point first, it is important to recall that "[n]o error in . . . the exclusion of evidence . . . is ground . . . for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice." M. R. Civ. P. 61. Moreover, the court "must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." M. R. Civ. P. 61. Thus, we have stated that

> [o]ur analysis does not end . . . if an appellant demonstrates that a district court has abused its broad discretion in rendering an evidentiary ruling. We must then determine whether the demonstrated abuse of discretion constitutes a reversible error. As we have held, no reversible error occurs unless a substantial right of the appellant is affected, nor does reversible error occur unless the evidence in question was of such character as to have affected the outcome of the trial.

*Seltzer v. Morton*, 2007 MT 62, ¶ 65, 336 Mont. 225, 154 P.3d 561 (citations omitted).

¶123 As discussed below, I do not agree with Evenflo and the Court that the District Court abused its discretion in excluding evidence of Evenflo's compliance with FMVSS 213. Indeed, Judge Swandal's orders reviewing the punitive damages award and

denying Evenflo's post-trial motions are exceptionally well-researched, well-reasoned, and well-written, and they fully support his evidentiary rulings. But assuming for the moment, and for the sake of argument, that the court did abuse its discretion and that the 213 compliance evidence was relevant, Evenflo has not shown that it suffered prejudice.

¶124 The jury was instructed that liability for punitive damages could be imposed only if Evenflo was guilty of actual fraud or actual malice. The court gave the jury the following definitions, which are consistent with § 27-1-221(2) and (3), MCA:

> Fraud: "[E]ither the making of a representation by the defendant with knowledge of its falsity or concealing a material fact with the purpose of depriving the plaintiff of his/her property or legal rights or otherwise causing him/her injury."

> Malice: The defendant "has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff," and the defendant either "deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff" or "deliberately proceeds to act with indifference to the high probability of injury to the plaintiff."

Given the overwhelming and compelling evidence of fraud and malice presented at trial, it simply cannot be said that evidence of Evenflo's compliance with FMVSS 213 would have affected the jury's verdict on Evenflo's liability for punitive damages. If anything, the jury might well have punished Evenflo more harshly had it known that Evenflo was seeking to excuse its reprehensible conduct by arguing that it had complied with FMVSS 213, even though Evenflo knew all along that FMVSS 213 contained only the "minimum" requirements for safety design and even though Evenflo had been told by the National Highway Traffic Safety Administration that "mere compliance with the minimum requirements of the standard is not enough." In any event, the following

52

evidence of actual fraud and actual malice was adduced at trial and, as the District Court noted, was established "by substantial, clear and convincing evidence."

¶125   On the evening of July 16, 2000, Jessica Malcolm was driving home with her son, four-month-old Tyler, properly secured in the back seat of the family Suburban in one of Evenflo's On My Way (OMW) child safety seats.  She was forced off the highway, and her vehicle rolled three times down a steep incline.  During the 50-mile-per-hour rollover, the left plastic seat-belt hook of Tyler's car seat broke off.  The seat then slipped out of the open-ended belt hook on the opposite side of the seat and came loose from the vehicle's seatbelt.  The car seat, with Tyler still strapped inside, was ejected from the Suburban and thrown through the air more than 60 feet.  The upper left corner of the seat hit the ground, and the force of this impact transferred through the hard plastic shell, fractured Tyler's skull, and caused fatal brain damage.  Had the seat remained restrained in the vehicle, there is virtually no chance that Tyler would have died in the rollover.  Had the seat been lined with energy-absorbing padding, the extent of his injuries could have been mitigated and his death could have been prevented.

¶126   Evenflo knew at all times that the basic purpose of a child safety seat is to restrain the child inside the vehicle to minimize the risk of ejection and that if the restraint fails and a child, still strapped in the safety seat, is ejected, the risk of serious injury or death is increased dramatically.  Evenflo also knew that a restraint system utilizing U-shaped, open-ended plastic seat-belt hooks was prone to fail, which could and did result in the OMW seat coming loose from the vehicle's seatbelts in both simulated and real-world

53

accidents. Despite this knowledge, all models of the OMW seat produced and sold from 1994 through 2002 relied on open-ended plastic seat-belt hooks to secure the seat to the vehicle's seatbelt.

¶127 Evenflo knew from the outset that the OMW seat could have employed a feasible alternative design: one requiring the vehicle's seatbelt to be routed through an enclosed seat-belt "tunnel" (as opposed to an open belt hook). This "bomb proof" design provides a substantial margin of safety and virtually eliminates the risk of a loss of restraint during an accident. Even before the OMW seat went into production, Evenflo used the tunnel design on most of its infant and convertible safety seats, and Evenflo then used it on the detachable base of the OMW seat itself. During the years it used this design, Evenflo knew of no instance in which an enclosed tunnel restraint system had failed and resulted in a loss of restraint, either in sled tests or in real-world accidents. When questioned at oral argument as to why Evenflo nevertheless chose the open hook design for the OMW, counsel asserted, ironically, that this design is more "user friendly."

¶128 All OMW seats lack protective foam padding, such as Expanded PolyStyrene (EPS), on the inside shell and sidewings. Such padding reduces the risk of head injuries to the infant in the event of an impact, and Evenflo utilized EPS padding in the shells of some of its safety seats for that very reason. Other manufacturers also utilized protective foam in the shells of their car seats prior to and during the eight years Evenflo sold the OMW seat. However, in 1993 (more than two years before Tyler Malcolm's OMW seat was produced), Evenflo considered whether energy-absorbing foam should be

incorporated into the OMW design and decided that the OMW seat—with its unpadded, hard plastic surfaces—was, in Evenflo's own words, "acceptable as is."

¶129 Evenflo marketed the OMW seat with knowledge of the dangers inherent in its design. As early as February 1995, Evenflo possessed videotapes which documented its own testing and showed OMW production models breaking apart in the area of the automobile seat-belt path and, due to the OMW's open belt hook design, coming loose from the test sled's seatbelt and ejecting from the sled. The cracks, rips, and tears in the shells of the tested OMW seats and the related loss of restraint provided Evenflo with notice that its OMW design exposed infants to the risk of severe injury or death from the seat's coming loose from the seatbelt and banging around inside the vehicle or, as in Tyler's case, being ejected from the vehicle.

¶130 Evenflo briefly halted production of the OMW seat in June 1995 to conduct a "consumer corrective action/recall campaign." Evenflo represented to the National Highway Traffic Safety Administration (NHTSA), to owners of OMW seats, and to the general public that the hazard posed by the OMW design was a "separation" under the seat's cloth padding that resulted in a sharp edge which could cause a "cut or pinch" hazard to the child. Evenflo did not disclose that the OMW's seat-belt hooks, and in some instances the entire corner of the OMW seat, had broken off during testing and, due to the open belt hook design, had allowed the seat (with the crash test dummy still strapped in) to fly off the test sled—a fact that Evenflo had recorded on videotape. Indeed, even though dozens of OMW seats had broken apart in sled tests, Evenflo

concealed that information and reported just four "separations" creating a "cut or pinch" hazard. Evenflo did not provide NHTSA with its videotapes showing OMW seats flying off the sled-test seats or any of its other documents and test reports that would have revealed the true hazard: potentially deadly ejections.

¶131 After making changes to the plastic mold at a total cost of $2,500, Evenflo resumed manufacturing and selling OMW seats just a few weeks after announcing the recall. Evenflo did not change the open belt hook design or the unpadded shell design and did not inform the public of the problems with these designs. Moreover, Evenflo had no idea why some of its OMW seats were cracking and breaking in tests and others were not, and the design flaw responsible for the cracks, rips, and tears was never discovered. Thus, no true "fix" was ever implemented.

¶132 With respect to the 200,000 OMW model 206 seats it had manufactured and sold at the time of the recall, Evenflo decided to save money by designing a plastic "retrofit kit" which it mailed to current OMW users with instructions to install a plastic insert to the underside of the safety seat using double-sided tape. With respect to the 55,000 seats it had produced but not yet sold, Evenflo installed the "retrofit kit" itself, rebranded the seats as model 207x, and sent all 55,000 seats to retailers. Evenflo took these actions with knowledge that it had not eliminated the deadly hazards posed by the weak open-ended plastic seat-belt hooks and the lack of EPS padding.

¶133 After restarting production, Evenflo continued to withhold from NHTSA and the public its knowledge that the OMW seat was continuing to crack, tear, or peel back in the

area of the automobile seat-belt path at a dangerously high rate. Of the 580 sled tests run on both prototype and production versions of the OMW seat without its detachable base, more than one out of four (27%) of these "safety" seats cracked, tore, ripped, separated, or peeled back at or near the open-ended belt hook. Thus, if all of the 3.7 million OMW seats manufactured by Evenflo were involved in collisions where the resulting forces equaled or exceeded the forces generated in the 27 to 30 mile-per-hour simulated frontal collisions conducted by Evenflo, 999,000 could be expected to fail completely or at least crack, rip, tear, or demonstrate physical evidence of impending failure in the area of the seat-belt path, which in turn could lead to a loss of restraint.

¶134 Well before Tyler Malcolm was killed, Evenflo was aware that both retrofitted and production model post-recall OMW seats were breaking in real-world rollover accidents and coming loose from the automobile seatbelts. In 1997, Ruthie Gonzales of Merced, California reported to Evenflo that the seat-belt hook on her retrofitted model 207 seat had broken off during a rollover accident. The seat came loose from the vehicle's seatbelt and ended up on her front dashboard. In 1999, Devon Orneleas of Patterson, California reported to Evenflo that both seat-belt hooks had broken off her model 207 seat in a rollover accident. The seat came loose from the vehicle's seatbelt and flew forward when the seat's hooks fractured and broke away. She found her baby, still secured in the seat, on the front floorboard after the rollover.

¶135 Yet, rather than take corrective action or notify NHTSA or the public of OMW's propensity to fail and become unrestrained in rollover collisions, Evenflo moved the

57

Gonzales and Orneleas seats to its storage warehouse and concealed this information. Indeed, when Ms. Orneleas reported that she believed the OMW seat was defective because the seat-belt hooks had broken off her model 207 seat during a rollover, Evenflo responded that it had never before heard of such a thing happening. At the time it made this blatantly false representation, Evenflo knew full well that similar shell cracks and failures were occurring in its sled tests and that Ms. Gonzales's OMW seat was in its warehouse, broken seat-belt hook and all. Moreover, Evenflo told Ms. Orneleas that the OMW seat was designed to withstand only a 30 mile-per-hour frontal crash, rather than the physical forces present in a rollover crash. However, Randolph Kiser, Evenflo's Director of Product Safety, admitted at trial that rollover accidents involving OMW seats were perfectly foreseeable.

¶136 A number of other OMW users, who were involved in rear-impact, side-impact, and rollover accidents where the open belt hooks did *not* break, also reported to Evenflo that the seats had come loose from the automobile seatbelts. Yet, when Jessica Malcolm called Evenflo to ask whether the OMW seat was "safe to use" with her soon-to-be-born child, Evenflo told her that the seat was safe to use and that there were no problems with it. Evenflo did so despite knowing that dozens of OMW seats had been cracking in tests, despite knowing that the belt hooks had been breaking off in real-world accidents like the Gonzales and Orneleas rollovers, and despite knowing that unbroken OMW seats had been coming loose from the vehicle's seatbelts in other types of accidents. Randolph Kiser testified that Evenflo's position was that Jessica did not have the right to know

58

about any cracks, rips, or breaks in the OMW seats (either in testing or in real-world accidents). Kiser stated that as far as Evenflo was concerned, no consumer had the right to know about the shell failures and ejections because Evenflo did not consider them to be a "rampant safety related defect."

¶137 Evenflo has no way of determining how many OMW seats were actually involved in accidents. Neither Evenflo nor the government tracks that information, and Evenflo's document-retention policy in the 1990s required that documents pertaining to injuries or deaths resulting in claims or lawsuits be destroyed one year after the matter was concluded.

¶138 In sum, Evenflo knew that the purpose of an infant child safety seat, including its OMW seat, is to restrain a child safely to the vehicle's seatbelt in a protective cocoon of the seat's shell during a motor vehicle accident. Moreover, Evenflo knew full well that by virtue of its design, the OMW seat was prone to crack, rip, and tear when placed under load, resulting in a complete loss of restraint. And Evenflo's Randolph Kiser admitted at trial that the probability of serious injury or death to an infant strapped in a car seat increases dramatically when the seat becomes unrestrained. Nevertheless, Evenflo consciously manufactured and marketed the OMW seat as a product intended to keep infants safe and secure while traveling in a motor vehicle. Furthermore, Evenflo considered whether to add protective EPS padding to the hard plastic shell of the OMW seat to protect the infant passenger from skull fractures but decided that the product was "acceptable as is." As the District Court observed, the words "acceptable as is," as used

59

by Evenflo here, constitute "a perfect three-word definition of 'actual malice.' " Evenflo evinced a complete indifference to an infant's vulnerability to physical injury or death while strapped in one of its OMW seats, and as a result, Tyler Malcolm died. Indeed, when asked point-blank by the consumer, Jessica Malcolm, if the OMW seat was safe, Evenflo lied to her and told her that it was safe and that there were no problems with it.

¶139 Evenflo manufactured the OMW seat for eight years with knowledge (much of it recorded on its own videotapes, accident reports, and sled-test records) of the risks and dangers posed by the seat's design. Worse still, Evenflo concealed this information not only from NHTSA and the general public, but also from Jessica Malcolm specifically. Any doubt about whether this deceit was intentional was dispelled by Evenflo's corporate representative, Randolph Kiser, who testified unapologetically that neither Jessica Malcolm nor any other concerned parent was entitled to information about the OMW seat's deficiencies and the potentially deadly hazards the seat posed to children until Evenflo, in its own judgment, decided that the safety-related defects were "rampant."

¶140 In light of all this evidence, the District Court observed in its order reviewing the punitive damages award that Evenflo's misconduct was "neither isolated, nor accidental." In fact, Evenflo's motive was "*exclusively* profit driven." And Evenflo's reprehensible conduct—which extended over an eight-year period, involved the knowing distribution of millions of defectively designed automobile child-restraint seats, and resulted in one of the worst forms of physical harm (the death of a child)—was "among the most egregious to be encountered in a strict liability in tort, design defect case." Indeed, the court noted,

60

the State of Montana considers the probability of serious injury or death to an unrestrained child in a motor vehicle to be so great and so well-known that placing an infant in a vehicle without a proper restraint constitutes a criminal act (citing §§ 61-9-419 and -420, MCA). Having heard the witnesses and seen the evidence, the District Court concluded that "[i]t is difficult to conceive a template more naturally fitted to the most virulent form of profit-motivated reprehensibility."

¶141 In the face of all of this, Evenflo complains that it should have been allowed to tell the jury about its compliance with FMVSS 213. FMVSS 213 sets forth minimum requirements for child-restraint systems, *see* 49 C.F.R. § 571.213, and NHTSA required Evenflo to conduct internal testing of its OMW seats to determine if they complied with these requirements. FMVSS testing involves a front-end sled test at speeds of 27 to 30 miles per hour. FMVSS 213 does not require (nor does it preclude) side-impact, rear-impact, rollover, or high-speed testing.

¶142 Congress expressly cautioned, however, that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103(e). Indeed, Congress intended that "compliance with safety standards is not to be a defense or otherwise to affect the rights of parties under common law particularly those relating to warranty, contract, and tort liability." H.R. Rpt. 89-1776 at 24 (July 28, 1966). Moreover, NHTSA Administrator Ricardo Martinez, M.D. sent a letter to Evenflo and other manufacturers in September 1999 stating that "with the safety of our Nation's children at issue, mere compliance with the

61

minimum requirements of the standard is not enough." Dr. Martinez urged each manufacturer of child restraints "to ensure that their restraints perform *above* the minimum requirements of our standard." *See* 65 Fed. Reg. 1224, 1224-25 (Jan. 7, 2000) (emphasis added). Along these same lines, this Court warned, before Evenflo started selling its OMW seats in Montana, that bare compliance with a minimum standard does not necessarily establish that the defendant acted with due care—or, as applied in the punitive damages context, that the defendant acted without deliberate indifference to the high probability of injury to the plaintiff. If the circumstances are such that a danger exists beyond the minimum which the standard was designed to meet, then the defendant is liable for not doing more. *See Martel v. Montana Power Co.*, 231 Mont. 96, 104, 752 P.2d 140, 145 (1988).

¶143 The Court asserts that "[e]vidence of Evenflo's good faith effort to comply with all government regulations, including FMVSS 213, 'would be evidence of conduct inconsistent with the mental state requisite for punitive damages.' " Opinion, ¶ 99 (quoting *Sunburst*, ¶ 81). The Court opines that "Evenflo may have been able to persuade the jury that its compliance with FMVSS 213 showed that it had not evinced 'deliberate indifference' to the welfare of the occupants of the OMW." Opinion, ¶ 100. I disagree. For one thing, it is doubtful that Evenflo's proffered evidence even constitutes evidence of a "good faith effort to comply with all government regulations." The fact of the matter is that Evenflo did *not* comply in "good faith" with FMVSS 213; rather, Evenflo deliberately concealed from NHTSA the fact that OMW seats were breaking

apart in Evenflo's sled tests and were flying off the sled-test seats. Furthermore, given the mountain of evidence presented at trial that Evenflo knowingly misrepresented to Jessica Malcolm the risks and dangers posed by the design of the OMW seat, that Evenflo concealed from her certain material facts about the safety of the seat, and that Evenflo deliberately proceeded to act in conscious disregard of the high probability of injury to Tyler, there is no reasonable possibility that the jury, based simply on Evenflo's supposed "good faith" compliance with FMVSS 213, would have reached a different outcome, i.e., would have found Evenflo not liable for punitive damages. *Seltzer*, ¶ 65.

¶144 Indeed, while it purportedly was complying in "good faith" with FMVSS 213, Evenflo knew the following: that mere compliance with the minimum requirements of the standard "is not enough," particularly where a danger exists beyond the minimum that the standard was designed to meet; that NHTSA wanted Evenflo's child restraints to "perform above the minimum requirements"; that FMVSS 213 addressed only frontal collisions; that the OMW seat's open belt hook design had failed in a number of rear-impact, side-impact, and rollover accidents; and that Evenflo, therefore, needed to go beyond the minimum requirements of FMVSS 213 in its design of the OMW seat. Evenflo also knew how to test its safety seats in rollover crash scenarios, but Evenflo never chose to conduct rollover tests on the OMW seats. Rather, Evenflo was content to do only the bare minimum; and it only did that much because it could not have sold the OMW seat otherwise. As the District Court pointed out, Evenflo could not receive one

63

dime of profit if it did not first subject the OMW seat to FMVSS 213 testing. Thus, based on the evidence, the court concluded that

> [e]ach and every act of Evenflo relating to [its] adherence to FMVSS 213 was intended solely to free the company up to sell, and profit from, the On My Way. This includes stopping production of the OMW when it realized it could not entirely conceal the seat's non-compliance with FMVSS 213; writing to NHTSA, characterizing the hazard posed by the noncompliance as the risk of a "cut or pinch"; and making the bare minimum revisions it could to get the On My Way to comport with the minimal requirements of FMVSS 213 (none of which applied to rollover accidents) and back into production as quickly as possible.

Consequently, although this Court is concerned that Evenflo was not allowed to present the jury with evidence that might show why Evenflo " 'acted as it did, or failed to act, whatever the case may be,' " Opinion, ¶ 98 (quoting *Sunburst*, ¶ 84), the explanation afforded by the 213 compliance evidence tends, if anything, to bolster the jurors' decision to punish Evenflo. It in no way undermines their verdict.

¶145 Lastly, it must be acknowledged that Evenflo did tell the jury about, and present evidence of, its supposed "good faith" compliance with government regulations. As the Court notes in ¶¶ 72-75, Evenflo informed the jury in its opening statement that the OMW model 207 seat was tested "320 times by NHTSA, by the Canadian Government, by Evenflo, by independent test labs, and it passed every test. Every test, it passed." Evenflo contended that the Malcolms' design expert, Lou D'Aulerio, would say that "I've looked at these, and the Canadians, they got it wrong, NHTSA got it wrong, the independent labs got it wrong, the car seats didn't really pass those tests," but Evenflo asserted that "he's the only person that's going to testify to that." Evenflo reiterated that

64

"[t]here is not one testing agency that has found that the 207 did not pass the test." Then, at trial, Evenflo's Randolph Kiser testified that unlike the OMW 206, which failed to meet the minimal requirements of FMVSS 213, the OMW 207 was never recalled. Kiser testified at length regarding the engineering changes Evenflo had made to the OMW seat after the model 206 recall, and he attempted to impugn D'Aulerio's "test failures" chart by pointing out that D'Aulerio had included "failures" of model 206 seats and prototype seats in that chart. Kiser testified that NHTSA had conducted 22 tests on the model 207 seat and had not observed any cracks or any problems with the belt hooks. Similarly, Evenflo got D'Aulerio to acknowledge on cross-examination that "NHTSA passed all of the twenty-two tests it conducted on the model 207."

¶146 Furthermore, as the Court notes in ¶ 76, Evenflo repeatedly tested the boundaries of the District Court's FMVSS 213 ruling. For example, Evenflo's counsel asked D'Aulerio, "[Y]ou're the only one that's been critical of those test results" and "You have no information to share with these jurors that anybody other than you is critical of that testing." The District Court sustained the Malcolms' objection to the latter question; however, Evenflo's counsel, undeterred, nevertheless proceeded with questions such as "You can't sell a child restraint system until NHTSA has deemed it safe and effective, right?" "[Y]ou know that NHTSA has specifically tested the model 207, that's at question here," "[I]n each of the twenty-two [tests] conducted by NHTSA, NHTSA gave the tests a pass," and "[I]n each of the eighty-five tests that the Canadian Government did, the Canadian Government deemed them a pass." Notably, in response to these questions,

65

D'Aulerio clarified that his "test failures" chart did not identify "failures" using the "other criteria" being tested (i.e., FMVSS 213). Rather, he explained, "I'm simply saying that when it comes to the belt hook, and the surrounding area, that all those tests show an insignia problem there. That's all I made the list for." This concession by D'Aulerio, in conjunction with Evenflo's various questions about "test passes," undermines Evenflo's contention that it was not allowed to counter the Malcolms' "one-sided" characterization of the test results. D'Aulerio admitted on cross-examination that the model 207 had passed NHTSA's 22 tests and that his "test failures" chart was not based on those same government criteria, but rather was based on problems with the belt hook.

¶147 Thus, Evenflo effectively introduced evidence that it had complied with government regulations in relation to the model 207 seat at issue. Indeed, during closing argument, Evenflo attempted to summarize the evidence as follows: "This product is regulated by the United States Government, by the Canadian Government, it's been tested by both governments, by the independent labs. And every lab that man mentioned, has tested this, this 207, and not one lab – " (The court then sustained an objection by the Malcolms.)

¶148 Moreover, Evenflo called William Van Arsdell, an engineer and design expert, who testified in essence that Evenflo's goal in using the open belt hook design was to facilitate child safety. Van Arsdell stated that in his opinion, the open belt hook design had advantages over the Malcolms' alternative "tunnel" design. In particular, he offered that this design was "so much easier" and convenient to use than the tunnel design and,

66

for this reason, that a person would be more likely to properly restrain their child in a seat which used an open belt hook design. Van Arsdell stated that he was not aware of anyone aside from D'Aulerio who had criticized the open belt hook design.

¶149   Finally, Evenflo was given free rein to use the evidence of its cooperation and interaction with NHTSA in connection with the model 206 recall to argue against liability for punitive damages.  Indeed, Evenflo took full advantage of this evidence, arguing that this voluntary recall was proof that Evenflo took prompt corrective action when it discovered a design defect in the OMW seat.  Of course, the Malcolms used this same evidence to show (1) Evenflo's knowledge of the shell cracks that led to the recall, (2) how Evenflo lied to NHTSA, the public, and Jessica Malcolm about how badly the OMW seat was breaking apart and the true ejection hazards posed to children riding in car seats with open belt hooks, and (3) how Evenflo's so-called "fix" incorporated into the model 207 seat did absolutely nothing to eliminate the ejection hazard posed by the open belt hook design.   Nevertheless, as the District Court pointed out in its order denying Evenflo's post-trial motions, the jury saw and heard each side's interpretation of Evenflo's interaction with NHTSA and NHTSA's role in the recall and the subsequent "redesign" of the OMW seat.  Evenflo's hands were not tied, nor were its arguments limited, in dealing with this evidence.  The jury simply was not persuaded by the view of the evidence argued by Evenflo.

¶150   For the foregoing reasons, I would not vacate the Malcolms' punitive damages award.  I would hold that Evenflo has not demonstrated that it was prejudiced by the

67

District Court's exclusion of the 213 compliance evidence. For one thing, as explained in the preceding paragraphs, Evenflo was able to present and argue much of this evidence to the jury anyway. Moreover, the jury's verdict on Evenflo's liability for punitive damages is amply supported by substantial evidence of actual fraud and actual malice, and Evenflo has not shown that any additional 213 compliance evidence would have affected the outcome of the jury's deliberations.

**No Abuse of Discretion**

¶151 Turning back to the question of whether evidence of Evenflo's compliance with FMVSS 213 was even relevant in the first place, the Court states that "a good faith effort to comply with all government regulations 'would be evidence of conduct inconsistent with the mental state requisite for punitive damages.' " Opinion, ¶ 93 (quoting *Sunburst*, ¶ 81). As the District Court correctly pointed out, however, we "obviously did not intend this very broad language to suggest that evidence of compliance with government regulations having nothing to do with the particular design issues presented in a design defect case should be admitted, despite its irrelevance." Here, in order to sell its OMW seat, Evenflo had to certify that the product complied with FMVSS 213; and since compliance with this minimal standard was a mandatory condition on selling the product, the District Court concluded that "it does not reflect a voluntary choice in the product design process."

¶152 Moreover, the court pointed out that FMVSS 213 addresses only minimum levels of performance in 27 to 30 mile-per-hour *frontal* impacts and does not set forth any

68

requirements, or create any reasonable expectations in the mind of the manufacturer, concerning the dynamic performance of a child safety seat in a motor vehicle rollover. Furthermore, the present case involves a 50 mile-per-hour rollover crash, and the dynamic forces unleashed in a high-speed rollover crash are very different from those present in a 27 to 30 mile-per-hour frontal crash. Consequently, Evenflo's compliance with the minimal 27 to 30 mile-per-hour frontal-impact tests required by FMVSS 213 has little, if any, bearing on Evenflo's state of mind vis-à-vis the known defects in its OMW seats, the known dangers posed by the seat's open belt hook design, the expected performance of the seat in a rollover crash, Evenflo's failure to take corrective actions, and Evenflo's decision to make knowing misrepresentations to NHTSA and Jessica Malcolm.[2]

¶153   Of course, even if the 213 compliance evidence could be considered marginally relevant, this does not make the evidence automatically admissible. The Montana Rules of Evidence state that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M. R. Evid. 403. In this connection, the District Court aptly pointed out that evidence of Evenflo's supposed "good faith"

---

[2] Had Evenflo undertaken rollover testing of the OMW seat in an effort to comply with governmental safety regulations relating to rollover crashes, then it might be argued that evidence of such compliance is " 'evidence of conduct inconsistent with the mental state requisite for punitive damages.' " Opinion, ¶ 99 (quoting *Sunburst*, ¶ 81). But no such evidence exists here.

compliance with government regulations would have had the tendency to create juror confusion. Evenflo wanted to argue to the jury that because it complied with FMVSS 213, it did not knowingly misrepresent to Jessica Malcolm the risks and dangers posed by the design of the OMW seat, did not conceal from her certain material facts about the safety of the seat, and did not deliberately proceed to act in conscious disregard of the high probability of injury to Tyler. Section 27-1-221(2), (3), MCA. Yet, compliance with FMVSS 213 does not explain why Evenflo failed to ensure that OMW seats would perform *above* FMVSS 213's minimum requirements, why Evenflo manufactured and marketed a "safety" seat that it knew was defectively designed and posed a hazard of potentially deadly ejections, and why Evenflo knowingly misrepresented to Jessica Malcolm, NHTSA, and the public that its OMW seats were safe. The District Court was thus quite correct in concluding that the 213 compliance evidence would confuse the issues and mislead the jury (not to mention waste time). M. R. Evid. 403.

¶154 Evenflo has not shown that the District Court acted arbitrarily without conscientious judgment or exceeded the bounds of reason when it excluded the evidence of Evenflo's compliance with FMVSS 213. *Seltzer*, ¶ 65. I dissent from the Court's contrary holding.

**Conclusion**

¶155 The Court's decision as to Issue 4 ignores the overwhelming evidence of Evenflo's malice and fraud in the design, manufacture, and marketing of the OMW seat.

The Court remands this case to the District Court so that Evenflo may tell a new jury that the model 207 seat complied with minimum government requirements, notwithstanding the fact that Evenflo knew that mere compliance with the minimal requirements was not enough. The Court's decision is an affront to the jury which heard the evidence and awarded the Malcolms an appropriate amount of punitive damages.[3] The Court's decision is also unfair to Judge Swandal, who put up with Evenflo's pretrial discovery abuses and "gamesmanship" and then, as noted, issued exceptionally well-researched, well-reasoned, and well-written orders fully supporting his evidentiary rulings and his decisions to affirm the awards for compensatory damages and punitive damages.

¶156 The greater mischief of the Court's decision today, however, is that Chad and Jessica Malcolm will now be forced to retry their entire case to another jury on the issue of punitive damages. Judge Swandal noted that the Malcolms' grief from the devastating loss of their first-born son—ejected in his Evenflo "safety" seat at a location in full view of their living room window—was "so all-consuming" that this "All American Ranch Family" was forced to move away and give up its fourth-generation ranch life and heritage. The tragedy of the Court's decision today is that Chad and Jessica are stripped of their well-deserved and legally-sound award of punitive damages in the name of "fairness" to a corporation that demonstrated actual malice, actual fraud, and utter

---

[3] Indeed, I am certain that there is not a responsible parent in Montana—or, likely, the country—who would strap their child into an Evenflo OMW seat if, beforehand, they were presented with the facts that the Park County jury heard in this case regarding the seat and Evenflo's conduct.

contempt for the safety of the consuming public. I do not agree that Evenflo was treated unfairly or that the District Court's evidentiary rulings in any way "heightened the task" of Evenflo's defense with respect to liability for punitive damages (Opinion ¶ 86). It is, however, fundamentally unfair and unconscionable to force Chad and Jessica to relive the nightmare of Tyler's tragic and totally unnecessary death.

¶157 As for future cases, the Court again leaves unresolved "the problem of how the District Court could have ensured that the jury considered the OMW model 207's compliance with FMVSS 213 for purposes of punitive damages, but disregarded the same evidence for the purposes of compensatory damages." Opinion, ¶ 102; *Sunburst*, ¶ 86 ("Our decision raises the problem of how the District Court could have prevented the jury from hearing evidence of DEQ's role for purposes of compensatory damages, but allowed the jury to hear evidence of DEQ's role for purposes of determining the appropriateness of punitive damages. We need not resolve this dilemma, however."). I cannot understand the Court's refusal, in two decisions now, to provide any guidance on this dilemma—a dilemma solely of this Court's creation. Opinion, ¶ 103. Litigants and the civil justice system must not continue to be burdened, as here, with having to try often gut-wrenching cases to two different juries, first to prove entitlement to compensatory damages and then to prove entitlement to punitive damages—especially when the trial judge's only "error" was that he simply followed decades of this Court's precedent.

¶158 If, as the Court states in ¶¶ 44 and 100, evidence of a defendant's compliance with government regulations is not relevant to the issue of compensatory damages (a

72

conclusion with which I agree) but is relevant to the issue of liability for punitive damages (a conclusion with which I strenuously disagree), and if, as the Court states in ¶ 39, we are truly rejecting the approach of *Restatement (Third) of Torts: Products Liability* § 4(b), then I suggest that punitive liability necessarily should be determined in a separate proceeding by the same jury seriatim, i.e., immediately after the jury determines tort liability and compensatory damages. This is the approach already contemplated by § 27-1-221(7), MCA, with respect to liability for punitive damages and the amount of punitive damages. Moreover, this approach is supported by our decision in *Malta Public School Dist. A and 14 v. Dist. Court*, 283 Mont. 46, 938 P.2d 1335 (1997).

¶159 In *Malta*, which involved claims for breach of an insurance contract and unfair trade practices, we first noted that a court may, in furtherance of convenience or to avoid prejudice, order a separate trial of any claim, any separate issue, or any number of claims or issues. *Malta*, 283 Mont. at 50, 938 P.2d at 1338 (citing M. R. Civ. P. 42(b)). We then considered under what circumstances bifurcated issues should be presented to one jury seriatim or to two separate juries. We held that this determination depends on judicial economy, fairness to the parties, clarity of the issues, and convenience. *Malta*, 283 Mont. at 51, 938 P.2d at 1338 (citing *Martin v. Bell Helicopter Co.*, 85 F.R.D. 654, 659-60 (D. Colo. 1980)). Thus, for example, we concluded in *Malta* that the School District's breach of contract claim and its bad faith claim should be heard by the same jury because a second jury hearing the bad faith claim would first have to be educated about the underlying contract claim which the first jury had already heard and decided.

73

*Malta*, 283 Mont. at 52, 54, 938 P.2d at 1339, 1340. We observed that both claims involved virtually the same evidence and the same witnesses, who would be put to the inconvenience and hardship of a second trial. Thus, "only by trying the bad faith claim immediately after the breach of contract claim to the same jury will the parties avoid relitigating the entire matter. Such a result would further the interests of judicial economy, ensure fairness to the parties, maintain clarity of the issues and provide convenience to both the court and the parties." *Malta*, 283 Mont. at 52, 938 P.2d at 1339. To do otherwise, we observed, would result in a "gross injustice" and would deny the School District a "speedy remedy" on its claims. *Malta*, 283 Mont. at 53, 938 P.2d at 1339.

¶160 Likewise, in the run of cases, a jury considering the defendant's liability for punitive damages will first have to be educated about the plaintiff's underlying tort claim. Except for the evidence of compliance with government regulations, the evidence and witnesses in the two proceedings will be virtually the same. Thus, if two separate juries are used, the parties will have to relitigate the entire matter, with the concomitant waste of time, money, and resources. Judicial economy, fairness to the parties, clarity of the issues, and convenience to both the court and the parties are all facilitated by trying the tort liability/compensatory damages issue and the punitive liability issue in two separate proceedings by the same jury seriatim. I suggest that this is the most practical scheme given the Court's conflicting evidentiary rules regarding the use of evidence of compliance with government regulations.

74

¶161   While I concur in Issues 1, 2, and 3, I strenuously dissent as to Issue 4.


/S/ JAMES C. NELSON


Justice Patricia O. Cotter joins in the Concurrence and Dissent of Justice James C. Nelson.


/S/ PATRICIA O. COTTER